## UNITED STATES v. PULLMAN CO. et al.
## No. 994.

District Court, E. D. Pennsylvania.
Jan. 22, 1944.

Dissenting Opinion Feb. 2, 1944.

For former opinion, see 50 F.Supp. 123.

Wendell Berge, Asst. Atty. Gen., Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., Holmes Baldridge, and Frank Coleman, Sp. Assts. to Atty. Gen., and Paul Fitting, Sp. Atty., of Washington, D. C., for plaintiff.

Ralph M. Shaw, of Chicago, Ill., George Wharton Pepper, of Philadelphia, Pa., Seth W. Richardson, of Washington, D. C., Walter H. Jacobs, Lowell M. Greenlaw, and Guy A. Gladson, all of Chicago, Ill., Adrien F. Busick, of Washington, D. C., Winston, Strawn & Shaw, of Chicago, Ill., Davies, Richberg, Beebe, Busick & Richardson, of Washington, D. C., and Pepper, Bodine, Stokes & Schoch, of Philadelphia, Pa., for defendant.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

By MARIS and GOODRICH, Circuit Judges.

At the request of the court, the government and the defendants have each submitted a form of proposed judgment. Objections of each to the form submitted by the other have also been proffered, together with briefs setting forth the respective points of view. These have been fully considered.

The determination of the terms of the judgment which will accomplish that which is necessary in the public interest and which will not deal unfairly with the defendants has been a matter of some difficulty. The major subject of dispute between the parties and the point which has most troubled the Court is the extent to which the present tri-party relation among Pullman Company, Pullman, Inc., and Pullman Standard shall be affected. The government argues that Pullman, Inc., should be directed to dispose of all interest in Pullman Standard; in other words, present owners of the combined Pullman enterprises are to dispose of the manufacturing business and to stay in the sleeping car business. Defendants argue, in turn, that freedom of the market will be accomplished by provisions much milder than this. Their point is that elimination of the exclusive dealing features as between Pullman and the railroads and the establishment of an open market in the purchase of sleeping cars, by terms of the judgment, will accomplish all that the findings and the opinion of this court require.

Our conclusion is that the public interest requires the complete separation in ownership and direction of the business of manufacturing and the business of operating sleeping cars. We think the public will not get the competitive conditions to which it is entitled if the Pullman Company and the manufacturing organization from whom it has bought all its cars for many years (with slight exceptions immaterial here) remain locked in common ownership and direction. In so concluding we do not for a moment attribute to the parties before us lack of good faith in the acceptance of the court's judgment. We do think, however, that if we had adopted the defendants' suggestion we would have left in existence a condition which has been the source of much of the trouble and invite the probability of its repetition. There must, therefore, be what counsel for the defendants aptly characterizes as a divorcement.

We are equally clear, however, that the public interest does not require that the court make the choice for Pullman, Inc., as to which one of its present two businesses it shall continue to own and operate. Separation is not an end in itself; it is a means to provide an open market. Counsel

for the government have not given us, in their able brief, convincing arguments why the public interest requires a disposition of the manufacturing business instead of the service business. They have stressed with some force that the retention of the service business would be better for the interests of the shareholders of Pullman, Inc. With regard to that point, the court thinks that the problem what is for the best interests of the owners can well be settled by the owners themselves, whose money is invested in the enterprise. The object to be accomplished by the court's judgment is remedial, not punitive. Separation is a necessary element in the remedy. But there is no reason, in protection of the public interest, why the separation needs to be made more difficult than necessary for the defendants nor against their judgment of what is in their best interests.

The defendants should have a reasonable time, say three months, to explore the possibilities and provide a plan for the separation. They should have an additional period, perhaps a year, to effect it. If they cannot accomplish it by that time, the court will have to order it done by such means as its ingenuity may devise. But defendants should have opportunity to try it themselves first.

With regard to the other points in the judgment, there is only one matter which we think requires comment. Since a separation is to be effected and since the Pullman Company and Pullman Standard will not only be separate entities in law but owned separately in fact, we see no reason why Pullman's future purchases of cars need be subjected to rules of competitive bidding.

The other provisions of the judgment may, we think, be worked out between the parties. The draft submitted by the government may be taken, except for the points above discussed, as a basis. If the parties are unable in the light of this opinion to agree upon the form of the judgment the Court will, upon being advised of their inability, settle the form.

BIGGS, Circuit Judge (dissenting in part).

While I concur in part in the views expressed in the majority opinion, I dissent because I think that the decree to be entered by the court will not effect a realistic solution of the problem which confronts us. We have concluded that the monopoly cannot be ended solely by injunction and that it is necessary to compel the divorcement by Pullman, Inc., of certain of its subsidiary companies. The majority of the court invite Pullman, Inc., to decide whether it shall divest itself of the service company, Pullman Company, or shall divest itself of the manufacturing units typified by Pullman-Standard Manufacturing Company. In my opinion we should decide what company or companies should be divested. Our decision should compel Pullman, Inc., to sell its interest in Pullman-Standard and should cause Pullman Company to make use of a competitive bidding system for the acquisition of new cars.

I have little doubt that in exercising the choice that the majority confers upon it Pullman, Inc., will try to dispose of its stock in Pullman Company and will endeavor to retain the stock of Pullman-Standard and the other manufacturing units. This should prove to be the case for at least two reasons. First; it is probable that more money will be made in manufacturing new sleeping cars than in servicing sleeping cars. Cars now in the Pullman pool will be largely obsolete by the war's end. New cars of modern light-weight construction must then be supplied to or purchased by the railroads. The market for new sleeping cars will be large and vigorous. Second; only about 15% of the business of Pullman-Standard was devoted to making new sleeping cars prior to December 7, 1941. Pullman-Standard, therefore, will be but little affected by the decree.

In my opinion the sale of Pullman Company and the retention of the manufacturing units by Pullman, Inc., will be contrary to the public interest for the following reasons.

First; the manufacturing properties and their superior directing personnel are on one side and Pullman, Inc., Pullman Company and their superior directing personnel are on the other. About two-thirds of the military passenger traffic in the United States is presently carried in Pullman sleeping cars and civilian passenger sleeping car traffic has been augmented enormously by war factors. Nearly half of the 7,000 sleeping cars in the Pullman pool

are now engaged in moving troops.[1] Whoever may be the purchaser of the stock of Pullman Company, new management for it becomes inevitable. This may result in the dislocation of a service the maintenance of which at this time and under present circumstances has taxed the skill and ingenuity of even the present highly trained directing personnel of Pullman Company.

Second; the probable effect of the court's decree will be to compel the railroads of the United States, which must maintain adequate through sleeping car service, to purchase the stock of Pullman Company. The railroads are keenly competitive. Their need for sleeping cars varies widely. To what extent is each to contribute to the maintenance of the Pullman pool which we are unanimous in believing must be maintained? Who will police the operations of the pool in order to make sure that those carriers who contribute to the purchase of Pullman Company stock (contributions which must vary in amount in accordance with needs and resources) will treat their partners in the joint enterprise or the public without discrimination. I know of no power presently vested in the Interstate Commerce Commission or in any other government agency which would enable it to regulate such a pool operation.[2]

Third; the element of time is important in the present case. The monopoly must be broken soon enough to permit an active and untrammelled market for new lightweight sleeping cars at the close of the war. The operations of Pullman Company are highly specialized. It will be difficult to find a purchaser for Pullman stock unless it be the railroads or interests representing them. In any event there must be delays in effecting the sale. Pullman Company stock will be found to be not readily salable whoever the purchaser may be. The decree of this court, therefore, will delay the end of the monopoly instead of promptly obliterating it as the public interest requires. Indeed, if the war should end before the Pullman Company stock is sold, I can scarcely believe that any purchaser will be found for it. . Neither the railroads nor any other person could be expected to expend money to buy obsolete equipment. The desirable pool operation as now constituted would fall. Our decree would be a futility.

Fourth; it is a striking anomaly that the tortfeasor, Pullman-Standard, should be left in a position where it can profit greatly by way of the monopoly from the sale of light-weight sleeping cars in the postwar market. Pullman-Standard through Pullman, Inc. will be left in possession of those railroad contacts which have brought it valuable contracts in the past. If the railroads purchase the Pullman Company stock, railroad representatives must sit on the board of directors of Pullman Company and, absent any injunctive requirement that Pullman Company must buy new cars under a competitive bidding system, Pullman Company will purchase new sleeping cars as in the past from Pullman-Standard. Under these circumstances I conceive that the engrossment of the market by Pullman-Standard will continue and that it will be a bold competitor who will hazard capital in the manufacture of sleeping cars. There is a momentum in the existing monopoly which it is unrealistic not to recognize.

If, upon the other hand, this court were to compel Pullman, Inc., to divest itself of the stock of Pullman-Standard and were to couple with this the requirement that Pullman Company should purchase new cars by a competitive-bidding system, the market would be cleansed of the monopoly promptly. The stock of Pullman-Standard is readily salable. Its superior directing personnel might remain as now constituted since, as I have indicated, there is a cleavage between the personnel of Pullman-Standard on the one hand and that of Pullman, Inc., and Pullman Company on the other. The nexus between the manufacturing units and the railroads would be

---

[1] See the pamphlet "Performing in War and Preparing for Peace" by George A. Kelly, Vice-President of The Pullman Company, published October 7, 1943.

[2] In making this statement I am not unmindful of the "car-service" provisions of the Interstate Commerce Act. See Section 1, subsections (10), (11), (13–16), 49 U.S.C.A. § 1(10), (11), (13–16). These sections do not contemplate the operation or policing of a pool of the kind which Pullman Company has maintained.

It should also be noted that Congress has found it necessary as a matter of public policy to prevent the pooling or division of traffic, or of service, or of gross or net earnings, by the common carriers by railroad, except upon specific approval by order of the Interstate Commerce Commission. 49 U.S.C.A. § 5(1).

broken. The monopoly thus obliterated could not recur.

For all of these reasons if I were free to do so I would put into effect the substance of the decree proposed by the United States. The decree which will be entered under the majority opinion to my mind will not effect the end required by the anti-trust laws of the United States.