### UNITED STATES v. PULLMAN CO. et al.
#### Civil Action No. 994.

District Court, E. D. Pennsylvania.

Dec. 18, 1945.

Final Order Jan. 4, 1946.

Holmes Baldridge, Sp. Asst. to Atty. Gen., for the United States.

Ralph M. Shaw, of Chicago, Ill., George Wharton Pepper, of Philadelphia, Pa., Seth W. Richardson, of Washington, D. C., Lowell M. Greenlaw, of Chicago, Ill., Frederick H. Spotts, of Philadelphia, and Guy A. Gladson, of Chicago, Ill., for defendants.

John Dickinson, of Philadelphia, Pa., S. R. Prince, of Washington, D. C., E. E. McInnis, of Chicago, Ill., and Jacob Aronson, of New York City, for intervening railroads.

Lewis M. Stevens, of Philadelphia, Pa., H. Eastman Hackney, of Pittsburgh, Pa., Benjamin H. Weisbrod, of Chicago, Ill., Andrew B. Young, of Philadelphia, and James W. Close, of Washington, D. C., for Standard Steel Spring Co.

Francis H. Scheetz, of Philadelphia, Pa., and Leo F. Tierney and Carlos A. Spiess, both of Chicago, Ill., for Glore, Forgan & Co.

Lemuel B. Schofield and W. Bradley Ward, both of Philadelphia, Pa., and Thurman Arnold and Arne C. Wiprud, Asst. Attys. Gen., for Otis & Co.

Robert J. Bulkley, of Cleveland, Ohio, and James F. Masterson, of Philadelphia, Pa., for Chesapeake & O. Ry. Co., New York, C. & St. L. R. Co. and Pere Marquette Ry. Co.

Paul W. Knox, of Philadelphia, Pa., and Leo J. Hassenauer, of Chicago, Ill., for Order of Railway Conductors, Pullman Clerks Association, Independent Pullman Workers Federation, and Pullman Company's Employees' Association of The Repair Shops.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges, sitting pursuant to the Expediting Act (Act of Feb. 11, 1903, as Amended, 36 Stat. 854, 1167, 15 U.S.C.A. § 28).

GOODRICH, Circuit Judge.

This case now comes to the Court upon an application for approval of a contract of sale. On March 22, 1945 the Court made an order permitting Pullman, Inc. to cause the Pullman Company to offer to "treat with the railroads or any other persons for the sale of the Sleeping Car Business and the properties connected therewith now owned by The Pullman Company." Pullman, Inc. was also authorized to treat for the sale of the stock of the Pullman Company. Pursuant to this authority Pullman, Inc., on May 12, 1945 made an offer of sale to the railroads. This offer was not, at the time, accepted. During the period between the date of that offer and the present, four propositions have been submitted to Pullman, Inc. for the disposal of the stock of the sleeping car company. The first is from Otis and Co.; the second is from Glore, Forgan and Co.; the third is from the Standard Steel Spring Company and the fourth from a group of railroads. The railroad group subsequently modified their proposition so as to constitute it an unqualified acceptance of Pullman, Inc.'s original offer to sell and the latter now comes to the Court asking for an order approving the sale.

The individual offerors, a number of the railroads, a number of unions representing employees of the Pullman Company and the States of California and Colorado have, with the Court's permission intervened.[1]

[1] The list of interveners as of December 10, 1945 was:

Otis & Co., Glore, Forgan & Co.; Standard Steel Spring Company.

The Atchison, Topeka and Santa Fe Railway Company; Atlantic Coast Line Railroad Company; The Baltimore and Ohio Railroad Company; Chicago, Burlington & Quincy Railroad Company; Henry A. Scandrett, Walter J. Cummings, and George I. Haight, as Trustees of Chicago, Milwaukee, St. Paul and Pacific Railroad Company; Chicago and North Western Railway Company; Joseph B. Fleming and Aaron Colnon, as Trustees of The Chicago, Rock Island and Pacific Railway Company; Great Northern Railway Company; Illinois Central Railroad Company; Louisville and Nashville Railroad Company; The New York Central Railroad Company; Howard S. Palmer, James Lee Loomis, and Henry B. Sawyer, as Trustees of The New York, New Haven and Hartford Railroad Company; Norfolk and Western Railway Company; Northern Pacific Railway Company; The Pennsylvania Railroad Company; Southern Pacific Company; Southern Railway Company; Union Pacific Railroad Company; Wabash Railroad Company; and L. R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company; Alabama Great Southern Railroad Company; Atlanta and West Point Railroad Company; Bangor and Aroostook Railroad Company; Boston and Maine Railroad; M. P. Callaway, Trustee of Central of Georgia Railway Company; Chicago Great Western Railway Company; The Cincinnati, New Orleans and Texas Pacific Railway Company; The Delaware & Hudson Railroad Corporation; Delaware, Lackawanna & Western Railroad Company; Wilson McCarthy and Henry Swan, Trustees of The Denver & Rio Grande Western Railroad Company; Erie Railroad Company; Scott M. Loftin and J. W. Martin, Trustees of Florida East Coast Railway Company; Georgia Southern and Florida Railway Company; The Kansas City Southern Railway Company; Lehigh Valley Railroad Company; Maine Central Railroad Company; The Nashville, Chattanooga and St. Louis Railway Company; New Orleans and Northeastern Railroad Company; The Pittsburgh and Lake Erie Railroad Company; Reading Company; Richmond, Fredericksburg & Potomac Railroad Company; The Western Pacific Railroad Company; and The Western Railway of Alabama; Chesapeake and Ohio Railway Company; The New York, Chicago, and St. Louis Railroad Company; and the Pere Marquette Railway Company.

The Order of Railway Conductors of America; The Pullman Clerks' Association; The Pullman Car Employees Association of the Repair Shops; The Independent Pullman Workers Federation; Pullman Porters Union; Brotherhood of Sleeping Car Porters; United Transport Service Employees of America:

States of California and Colorado.

The testimony presented by the various offerors was heard by the Court on November 5 and 6 and that presentation was followed on December 10, 11 and 12 by argument on the part of counsel for all parties who desired to be heard.

Because the considerations presented to the Court in argument upon the question of approval of Pullman's sale of its sleeping car business to the railroads have covered a wide field, it seems well to reorient ourselves to the questions now before us in this case.

The original proceeding was a suit in equity brought by the United States against Pullman, Inc., its associated companies and some individuals connected therewith. It charged Pullman with monopolistic practices which violated the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. The Court after a long series of hearings found that the defendants had violated the Sherman Act. Since all aspects of this part of the case were fully discussed in the original opinion that discussion need not be repeated here.

Relief against continuation of the monopolistic practices was discussed in the original opinion. 50 F.Supp. 123. Separation of Pullman Standard, which manufactures sleeping cars and other rolling stock, from the Pullman Company, which owns and operates the sleeping cars, was ordered. 53 F.Supp. 908. This separation was not an end in itself, but merely a means of policing to insure compliance with the decree. We left it to Pullman, Inc. to decide which end of its business it chose to retain and which to dispose of. Its choice was to dispose of the sleeping car business which is represented by the Pullman Company. Whether sold or retained by Pullman, Inc. the future conduct of the sleeping car business by the Pullman Company is, by terms of the judgment, subject to all the limitations imposed on it by the Court.

The sale now offered to us for approval is the final step in the proceeding to break the Pullman monopoly. It should not be thought of as the end product of the lawsuit. It is but a by-product. The main objects were accomplished in the elaborate judgment entered May 8, 1944, which followed the Court's opinion and findings of fact and conclusions of law. 55 F.Supp. 985.

We say all this because the argument has covered such a wide range that it might almost be thought that we had here a new proceeding in which the Court is being asked to determine the best way to conduct the sleeping car business for the benefit of the country at large. We do not think this very formidable undertaking is imposed upon us. We take it that the judgment of a court under the Sherman law is not to substitute the judicial judgment for that of the proprietors of the country's business enterprises. We think it is the court's task to strike at monopolistic practices when it finds them to exist and then leave it to competitive business, freed from monopoly, to take advantage of the freedom to profit itself and incidentally benefit the public.

So here, we think it is our responsibility to see that the disposal of its sleeping car business by the Pullman interests is done in a way which carries out the judgment of this Court. Pullman's choice of a customer has been the railroad group. Other prospective customers have described and extolled their offers both to the seller and to the Court. We think the variety of choice presented is a credit both to the ingenuity of those who thought up the various plans and to the lawyers who have presented them to the Court. Our conclusion is that the sale to the railroads should be approved.

In so concluding we want it to be perfectly clear that the restrictions imposed by the judgment upon the Pullman Company are still to be effective. Especially do we emphasize at this point the provisions of paragraph 26 of our judgment prohibiting exclusive dealing contracts. In the judgment, paragraph 10, we reserved the question of the extent to which persons acquiring the business or properties are to be bound by the provisions of the judgment. We now say that the terms are to apply to Pullman under the new ownership. That of course is clear from the terms of the judgment. They also are to be applied to any person or company to whom the railroads may later transfer the business, as contemplated by the provisions of their plan and a provision of our order will so state. We pass then, to a discussion of the reasons which have led us to the conclusion stated.

The railroads are the natural and obvious people to do sleeping car business. They are the ones who own the rails on which the cars are drawn; it is their locomotives which pull sleeping cars as well as coaches and freight cars. It is the railroads' obli-

gation to furnish the sleeping car service. This we think to be a point of highest importance in this connection. "Pullman service is like a public utility," we have been told. "Would you allow a public utility to be run by its chief customers?" The analogy is almost completely inaccurate. Sleeping car service, like dining car service, is part of the essential business of carriage of passengers in a country where distances between points are as they are in the United States. The carrier is obligated to furnish the service or see that it is provided. Were it not for the historical accident of the independent development of the sleeping car company as a concessionaire to furnish the service, one would expect to find it furnished by the railroad itself.

One railroad furnishing sleeping cars to the passengers on its lines is certainly not a situation which anyone could see as a possible source of Sherman Act violation. That was granted, we think, in all the arguments made to us. In this case, however, railroads doing something more than 95% of the passenger carrying business of the country have joined together in the proposal to buy the stock of the Pullman Company. It does not follow that because one man can do a thing alone he can join with others in so doing. Does not this joining together of the railroads to own a sleeping car company simply substitute a railroad monopoly for the original Pullman monopoly? It has been asserted with great earnestness that it does by those other than the railroad group who seek to obtain the Pullman Company. That poses a relevant issue; the only one, we think, now before us. We think the answer is that it does not for the following reasons:

I. Part of the Pullman monopoly was its sale of cars manufactured by one of its companies (Pullman Standard) to the Pullman Company, which owned and operated the sleeping cars. No other car manufacturer could get into the market. On the occasions when he got an order for sleeping cars from the railroads who were interested in new developments, that purchase created difficulties with the road's sleeping car service because of the obstacles to such experiments put in its way by Pullman. This is described in the original opinion and need not be enlarged upon here. That phase of the monopoly is now gone. It is struck down by the provisions of the judgment and those provisions are reinforced by the order directing separation of the manufacture and servicing businesses from one ownership. The Government, in objecting to the proposed sale to the railroads, suggests that the habit pattern of railroads purchasing from Pullman Standard would be likely to be continued if the railroads owned Pullman.

This is a point of great force if established. It is not the kind of proposition that can be proved by mathematical demonstration either way. It can be replied that the habit pattern which was established only amounted to the purchase of sleeping cars by the Pullman Company from its manufacturing associate in the Pullman family, Pullman Standard, and it can be pointed out that even back in those days the railroads tried to break away by purchase of cars elsewhere and got into difficulty with Pullman when they did.

All the above is true. Yet it is also true that there have been interlocking directorates between Pullman, Inc. and the railroads. We talked about those in our original opinion. It is only in the last few weeks that some of these common directors have dropped out of Pullman, Inc. and we are not advised that all of them have done so even yet. We think there is very great danger to the public interest if the railroads by interlocking directorates, or whatever means there may be, continue the kind of tie-up which we found to exist and talked about in our original opinion in this case. We are, therefore, going to impose three conditions in the order confirming this sale.

(1) The first is that there shall be no interlocking directorates between Pullman Standard, Pullman, Inc. and the railroads. The reason for this is obvious and requires no further explanation.

(2) We shall require the Pullman Company if and when it buys new sleeping cars to purchase them under competitive bidding. This is a change in position from what we indicated earlier in the course of this litigation. It is also a provision covering a situation which may never come into being for we do not think it likely that the Pullman Company, itself, will purchase new sleeping cars. But if this Company does or its successor does, the competitive bidding requirement will come into play.

(3) The third condition is that the railroads, in purchasing sleeping cars following consummation of the transaction under consideration, shall also purchase them from

manufacturers following competitive bidding. The railroads are not defendants in this lawsuit and we know that perfectly well. But they are, for their own business purposes, coming in to deal with the business and property of a company that has got into serious trouble under the Sherman Act. We do not want the practices established under the monopolistic regime to carry over into the operation in the hands of the new owners. The requirement for competitive bidding will, we think, shut off the last possibility of any untoward influence of Pullman Standard following sleeping cars into the hands of the people who now take over.

II. We see no danger of the perpetuation of monopoly in a railroad owned sleeping car business. Here we must look rather closely at our concept of what constitutes an unlawful monopoly in this connection. The thing which got the Pullman Company into trouble was not that it was the only company furnishing sleeping car service, but that Pullman made it virtually impossible for anybody else to get into the business. This applied not only to a competing concessionaire, but even to a railroad which sought to run part of its own sleeping car service and let Pullman do the rest. We think we have got rid of all that by the careful limitations imposed upon Pullman Company by the original judgment in this case, and which will be imposed upon its successors by the order which we shall enter. A railroad may join with others and use exclusively the services of Pullman. It may do part of that service itself, or through some other concern of its own choosing, and ask Pullman to do the rest. It may own all of its own sleeping cars, or part of them, or none of them. All of this is provided for in our judgment. There is, then, no strangle hold on the sleeping car business by a railroad owned Pullman Company or anyone else. Therefore there is no unlawful monopoly. If there is only one store in a town at which everyone trades, that fact does not itself constitute a monopoly in the legal sense. It is only when the merchant maintains his position by devices which compel everyone to trade with him exclusively that the situation becomes legally objectionable. So here. If the railroads who are the ones responsible for providing sleeping car service can take or leave Pullman assistance to that end, there is no objection to the fact that most of them may prefer to employ the Pullman concessionaire.

This whole problem would be a more simple one if the order could be that Pullman go out of the sleeping car business and sell to the individual railroads at fair terms such of its supply of sleepers as individual railroads needed. But that should not be done. The necessity of a reserve pool of cars to meet peak loads of all and seasonable requirements of some of the roads was discussed in the main opinion in this case. In the nature of things, this must be a common pool, with some sort of unified operation and control, if it is to be effective. All the parties have recognized the necessity of maintaining this pool, though various bidders have accused rivals of seeking to destroy it. The railroad plan proposes to maintain such a reserve, through a cooperative venture in which all may join. The proposal is that for the present all sleeping cars, whether bought by individual roads or not, shall be in the general pool. This is imperative, since the armed forces need the service, and the emergency is not yet passed. Then it is proposed, after a period not to exceed three years, to set up or find a service concern which shall own the reserve pool of cars and furnish operating service to the roads which wish it. How do we know this will work? We cannot, for certainty, of course. Nor can we know for a certainty that the plans proposed by any bidder will work in a future which none of us can foresee. But we do know that the problem will be in the laps of those whose legal obligation it is to provide sleeping car service and who, by reason of that fact, must solve it. We also know that if any one of the partners in the cooperative enterprise starts to play fast and loose with one of its associates, this Court is open to a suitor who claims that our decree is not being complied with.

A great deal of argument has been presented to us during the hearing about the majority of the companies which own and operate the railroads of the country. They are said to be sleepy and unprogressive. The roads in turn have offered testimony to the effect that they are industrial greyhounds, straining upon the start. We make no finding of fact on this point, nor confer either encomiums or epithets. We are concerned only with a small fraction of the total railroad business, that which has to do with sleeping cars. This part will probably rise little higher than the general level of railroad competence. We do not think, in any event, it is within judicial responsibility or competence to make it do so.

We are also told that the railroads are dominated by a group of bankers and that the influence of the latter, if not sinister, is at least unprogressive and monopolistic in its tendency. When we reach this question we are beyond the scope of issues in this lawsuit which had Pullman, not the railroads, as defendants. The record tells us nothing of the operations of railroad bankers nor of the war between them, if such there is. Surely we should be going far beyond proper judicial process if we played, either way, any hunches we may have, about this question.

Approval of the sale to the railroads does not imply disapproval of other bidders. We are much impressed with all of them. We do not approve Pullman's selection because it has chosen the bid that brings it what it regards as the most favorable terms. We approve it because, following our direction to sell, it now appears with a buyer. That buyer is, as said above, the most natural purchaser, because it has the legal responsibility for providing sleeping cars and comes in under terms which we are satisfied are in accordance with the judgment of this Court.

Pullman with notice to counsel for the United States and the railroad buying group may submit a form of order for approval of its sale which embodies the provisions discussed in this opinion.

## Final Order.

This cause came on to be heard upon the application of Pullman, Inc. for approval of its executory contract of sale of stock to certain purchasing railroads, and, after testimony had been taken in court, was fully argued by counsel. Whereupon, upon consideration of the said application and of the petitions filed by several intervenors, it is upon motion of Ralph M. Shaw, Esq., Seth W. Richardson, Esq., and George Wharton Pepper, Esq., of counsel for the applicant, ordered, adjudged and decreed as follows:

1. That the said contract of sale be and the same is hereby approved upon the conditions herein specified.

2. That the said conditions of approval are the following:

(1) That no person shall be at the same time a director of Pullman, Inc. and of any vendee railroad, or of Pullman Standard and of any such railroad, or of Pullman, Inc. and of Pullman Company, or of Pullman Company and of Pullman Standard;

(2) That in the event that Pullman Company desires to acquire new sleeping cars the purchase shall be made only after competitive bidding in the same manner as provided by the regulations ordered by the Interstate Commerce Commission on October 6, 1919, to be effective for competitive bidding, as those regulations have been or may hereafter be amended from time to time by the Interstate Commerce Commission;

(3) That in the event that any vendee railroad desires to acquire new sleeping cars the purchase shall be made only after like competitive bidding;

(4) That the term "vendee railroad" as used in the foregoing sub-paragraphs (1) and (3) of Paragraph 2, means a railroad which has purchased and at the time owns or controls any of the stock of the Pullman Company or at the time owns or controls the stock of any corporation to which any of the stock of the Pullman Company, or the assets or business of said Pullman Company or any substantial portion of the said assets of business, may be sold or transferred;

3. That after consummation of the sale hereby approved, Pullman Company and any person or corporation to whom the vendee railroads may hereafter sell Pullman Company's stock or assets shall continue to be bound until further order of the Court by all the provisions of the decree of this Court made May 8, 1944.

4. That the Pullman Company or any person or corporation to whom the vendee railroads may hereafter sell Pullman's stock or assets shall offer to enter into a contract to supply, as available, excess sleeping cars, not purchased by individual railroads, upon proper terms, to such railroads as may desire such contract.

5. That such detailed agreement as Pullman, Inc. and the vendee railroads may formulate in order to consummate the sale hereby approved shall before execution be submitted to this court for approval together with evidence that no such interlocking directorates continue to exist as are herein disapproved.

6. That the terms of the order of this Court entered March 22, 1945, are hereby declared to have been complied with by Pullman, Inc.

7. That the declarations of this order shall have the same effect as if injunction had issued to enforce them.

114

8. This order is made without prejudice to the rights of the employees of the Pullman Company under existing contracts and practices.

9. That jurisdiction of this cause is retained for the purpose of effectuating the provisions of this order.

> JOHN BIGGS, Jr.
> ALBERT B. MARIS
> HERBERT F. GOODRICH
> Circuit Judges