**ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN, etc., et al.,
Plaintiffs,**

v.

**UNITED STATES of America et al.,
Defendants.**

**No. 64 C 1401.**

United States District Court
N. D. Illinois, E. D.

Nov. 30, 1966.

Burke Williamson, Adams, Williamson & Turney, Chicago, Ill., Harry Wilmarth, Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for plaintiffs.

A. L. Foster, Chicago, Ill., for Pennsylvania R. R.

Martin Rock, Sidley, Austin, Burgess & Smith, Chicago, Ill., for The Pullman Co.

Edward V. Hanrahan, U. S. Atty., for the United States.

## MEMORANDUM OPINION

Before SWYGERT, Circuit Judge, and PERRY and MAROVITZ, District Judges.

MAROVITZ, District Judge.

Plaintiffs bring this action to enjoin and set aside an order of the Interstate Commerce Commission entered in Docket No. 29592 entitled, "Proposed Pooling of Railroad Earnings and Service Involved in Operation of The Pullman Company Under Railroad Ownership," reported as 322 I.C.C. 100.

Plaintiffs are (a) the Order of Railway Conductors and Brakemen, an unincorporated association, which is the representative of Pullman conductors; and (b) three individuals who are employed as Pullman conductors.

Defendants are the United States of America, the Interstate Commerce Commission, The Pennsylvania Railroad Company, a corporation, and The Pullman Company, a corporation.

This cause came on for hearing on October 27, 1966, before this statutory three-judge United States District Court which finds that it has jurisdiction of the subject matter hereof and of the parties hereto.

Because the Interstate Commerce Commission's order of January 16, 1964, herein sought to be set aside, begins with the phrase, "Upon the consideration of the record in the above-entitled proceedings, * * *." and because the record of the Commission in proceedings had in Docket No. 29592 "contains extensive testimony and numerous exhibits and other documents which pertain to issues wholly foreign to the issues in the matter before the Commission involved in this cause," all of the parties to this action entered into a stipulation which provided, among other things, that certain portions of the record of the Commission in Docket No. 29592 should be deemed a full and complete designation of all parts of the record of the Commission in said proceedings which, in the opinion of any party is in any way pertinent to the Commission's order of January 16, 1964, or to the issues of this proceeding. The parties accordingly submitted to the court the pertinent record, as stipulated, packaged in a volume entitled, "Joint Appendix of All the Parties" which this court has examined and has considered together with the pleadings and briefs and oral arguments of counsel.

Following the entry by the Commission of its January 16, 1964 order here involved, the petition of plaintiff Order of Railway Conductors and Brakemen (ORC&B) for reconsideration by the Commission of its order was denied.

To better comprehend the issues presented by the instant case, we must go back to 1940. At that time the United States brought an antitrust proceeding in the United States District Court for the Eastern District of Pennsylvania, at Philadelphia, alleging the violation of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act by Pullman, Incor-

porated, Pullman Standard Car Manufacturing Company and the Pullman Company. In a decision (United States v. Pullman Co.) reported at 50 F.Supp. 123 (D.C., 1943), the court concluded that there had been a violation of the Sherman Act and decided (D.C., 53 F.Supp. 908) that the public interest required the complete separation in ownership and direction of the business of manufacturing and the business of operating sleeping cars. The court directed Pullman, Inc., to choose whether it wanted to divest itself of its manufacturing business (Pullman-Standard Manufacturing Company) or its service company (Pullman Company). Pullman, Inc., elected to dispose of its service company and the court approved the executory contract of sale of stock to certain purchasing railroads. (D.C., 64 F.Supp. 108)

Section 5(1) of the Interstate Commerce Act, 49 U.S.C. § 5(1), provides, in part—

"§ 5. *Combinations and consolidations of carriers.*

*Pooling; division of traffic, service, or earnings*

"(1) Except upon specific approval by order of the Commission as in this section provided, and except as provided in paragraph (16) of section 1 of this title, it shall be unlawful for any common carrier subject to this chapter * * * to enter into any contract, agreement, or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; and in any case of an unlawful agreement for the pooling or division of traffic, service, or earnings as aforesaid each day of its continuance shall be a separate offense: *Provided,* That whenever the Commission is of opinion, after hearing upon application of any such carrier or carriers or upon its own initiative, that the pooling or division, to the extent indicated by the Commission, of their traffic, service, or gross or net earn-

ings, or of any portion thereof, will be in the interest of better service to the public or of economy in operation and will not unduly restrain competition, the Commission shall by order approve and authorize, if assented to by all the carriers involved, such pooling or division, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises * * *."

In 1946, certain railroads, including the Pennsylvania Railroad, made application under above quoted Section 5(1) for approval of a proposed pooling of earnings and service involved in the sleeping car business by the Pullman Company under railroad ownership and on May 6, 1947, the Interstate Commerce Commission entered its report and order in Docket 29592 approving and authorizing the proposed pooling. A Uniform Operating Contract was put into effect, retroactively, as of January 1, 1946, and thereafter was extended by agreement on expiration.

A subsequent Supplemental Application to the Commission under Section 5 (1) was made by the railroads for an order approving and authorizing a proposed further continuance and revision of the existing pooling arrangement under a new, proposed Uniform Service Contract and on August 22, 1949, the Commission entered its Supplemental Order approving and authorizing the continuance of the pooling subject to the conditions prescribed in the prior report.

Section 2 of the new Uniform Service Contract reads:

"Sec. 2. During the term of this contract Pullman shall furnish sleeping car service on the Lines of the Railroad, as hereinafter specified. In case the Railroad at any time desires to furnish part of such service in connection with its sleeping car operations, and shall request Pullman to furnish a partial form of sleeping car service on Lines of the Railroad, Pullman shall furnish such partial service

on reasonable and non-discriminatory terms; and this contract shall be subject to such modification as may, in the particular case, be necessary to provide reasonable and non-discriminatory terms therefor."

On May 29, 1962, the Pennsylvania Railroad notified the Pullman Company by letter that in accordance with Section 2 of the Uniform Service Contract it was exercising its right to request Pullman to furnish, effective October 1, 1962, a partial form of sleeping car service on the lines of Pennsylvania. After setting forth the services to be rendered by the Pullman Company (sometimes hereinafter "Pullman"), the letter stated that effective on October 1, 1962, the Pennsylvania Railroad Company (sometimes hereinafter called "Pennsylvania") would perform in connection with its sleeping car operations, the remaining services not listed therein for performance by Pullman.

On September 11, 1962, without making prior application to the Interstate Commerce Commission for authorization and approval under Section 5(1), Pullman and Pennsylvania executed an "Amendment to Uniform Service Contract" which provided for a partial form of sleeping car service by Pullman on local lines of the Pennsylvania Railroad, to become effective October 1, 1962, in line with the proposals set forth in Pennsylvania's letter to Pullman of May 29, 1962.

In a suit entitled Brogan, et al. v. Pennsylvania Railroad Company and The Pullman Company, filed in the United States District Court for this District on August 29, 1962, certain conductors of Pullman working on the sleeping car lines of Pennsylvania prayed for a declaratory judgment that the planned changes or arrangement by Pullman and Pennsylvania would be in disobedience of orders of the Interstate Commerce Commission and prayed that the defendant companies be enjoined from putting into effect the planned changes and from failing and neglecting to obey the orders of the Interstate Commerce Commission theretofore entered in Docket 29592. On October 5, 1962, the District Court, in Findings of Fact, Conclusions of Law and Decree, reported at 211 F.Supp. 881, enjoined the defendant companies from failing to comply with Section 5(1) by putting into effect the Amendment to Uniform Service Contract executed on September 11, 1962, without prior approval of the Commission, but provided that nothing in those findings, conclusions or decree should be deemed to preclude the Interstate Commerce Commission from deciding that its outstanding orders in its Docket 29592 would not be violated by the defendant companies' Amendment to Uniform Service Contract executed September 11, 1962, or that its specific approval in connection with said Amendment under Section 5(1) was not required. In its decree, the District Court also provided for the automatic expiration of its injunction against the defendant companies should the Commission decide that its outstanding orders had not been violated or that its specific approval of the defendants' Amendment was not required or if the Commission specifically approved the Amendment or the pooling resulting therefrom.

The Pennsylvania Railroad Company thereupon, on October 15, 1962, repaired to the Interstate Commerce Commission, petitioning for a declaratory order that the proposed arrangement for withdrawing from the Pullman Company the performance of certain sleeping car services on petitioner's lines was—

"not violative or otherwise in disobedience of any Orders of the Commission heretofore entered in the above-entitled proceedings;

"(b) not a new or changed arrangement for the pooling or division of earnings and service requiring the approval of the Commission in accordance with Section 5(1) of the Act; and

"(c) clearly contemplated by Orders heretofore entered by the Commission in the above-entitled proceeding,"

and on January 16, 1964, the Commission entered its Order (here under attack) which found that Pennsylvania's proposal and its contract of September 11, 1962, with Pullman do not violate the Commission's outstanding orders in Docket 29592 and do not require the Commission's specific approval under Section 5(1) of the Interstate Commerce Act.

Plaintiffs argue that Pennsylvania's proposed modification of the contract—withdrawing from Pullman the performance of certain sleeping car services on its lines—is a new and changed arrangement for pooling which requires the approval of the Commission in accordance with Section 5(1) of the Act, although they concede that the Commission would lack jurisdiction in the case of a railroad's complete withdrawal from a pooling arrangement.

The record before this court establishes that from the outset it was the design and intent that railroad members of the pooling arrangement should have the right to withdraw therefrom partially—that is, to withdraw from Pullman the performance of specified services and to perform those services itself.

In its 1943 opinion, the court in the antitrust case (50 F.Supp. 123), after finding that the Pullman companies had violated the antitrust laws, said:

"Among the matters in the mind of the Court which it deems relevant for inclusion in a proposed decree are the following:

\* \* \* \* \* \*

"4. The right of any railroad which wishes to operate all or a portion of its own sleeping car business so to do, regardless of existing sleeping car contracts with the Pullman Company."

In paragraph 23 of its Final Judgment entered in the antitrust case on May 8, 1944, the District Court provided that—

"Pullman, as long as it continues in the sleeping car business, shall offer upon reasonable and non-discriminatory terms to service, or furnish and service, and, if a contract providing therefor is made with such railroad, shall service, or furnish and service, sleeping cars on any line of any railroad at the request of such railroad, to the extent that cars are available, even though sleeping cars are about to be or are being furnished, serviced, or furnished and serviced, on other lines of the same railroad by the railroad itself or by some third party."

and paragraph 26 of that Final Judgment provided—

"Pullman shall not agree upon, insert in any contract, or enforce any so-called 'Exclusive Right' clause, or any similar provision, which shall give or purport to give to Pullman the exclusive right to furnish, service, or furnish and service, all of the sleeping cars on any railroad, or all of the sleeping car service of any particular type on any railroad, or which shall require that the railroad deal only with Pullman in the matter of furnishing, servicing, or furnishing and servicing, sleeping cars. Any clause in any existing contract between Pullman and any railroad which purports to grant such exclusive or similar right to Pullman is hereby declared to be and is henceforth unlawful, void and of no effect."

Turning to the original pooling agreement which was approved by the Commission back in 1947: One of its general purposes, as set forth therein, was to afford a means whereby every railroad, subject to the terms of that agreement, might—

(a) acquire all or any part of the sleeping cars regularly assigned to its lines;

(b) conduct its own sleeping car operation, in whole or in part, or arrange, through contract, on reasonable and non-discriminatory terms, for the conduct thereof by others;

(c) perform its own service or maintenance, or service and maintenance, of sleeping cars used in operations on its lines;

(d) procure such service or maintenance, or service and maintenance,

through contract on reasonable and non-discriminatory terms with The Pullman Company under railroad ownership or with a service company constituted as thereinafter set forth.

Following our historical thread, we come to the Uniform Service Contract—which was approved by the Commission—and specifically to Section 2 thereof which in unambiguous language provides that during the term of the contract Pullman shall furnish sleeping car service on the lines of the railroad, as thereinafter specified, and that in case the railroad at any time desires to furnish part of such service in connection with its sleeping car operations, and shall request Pullman to furnish a partial form of sleeping car service on lines of the railroad, Pullman shall furnish such partial service on reasonable and non-discriminatory terms. Section 2 concludes with the language: "and this contract shall be subject to such modification as may, in the particular case, be necessary to provide reasonable and non-discriminatory terms therefor."

In the Order here under attack, the Commission, after reciting that it had considered the record in Docket No. 29592, and after specifically referring to the original (1947) pooling agreement (which the Commission had approved) and also to the supplemental and revised pooling agreement of 1949 and the accompanying Uniform Service Contract (both of which had also been approved by the Commission) quoted not only Section 2 of the Contract but also Section 14(a) thereof which reads, "Nothing in this contract shall be construed as giving to Pullman an exclusive right to furnish sleeping cars or sleeping car service on Lines of the Railroad."

■ The court finds that Pennsylvania's proposed modification of the Uniform Service Contract constituted a partial withdrawal—a withdrawal *pro tanto* —from the pooling arrangement; that it was not a new or changed arrangement for pooling, and did not require the ap-

proval of the Commission under Section 5(1) of the Act.

Plaintiffs here assert that the Commission's Order of January 16, 1964 should be set aside because plaintiff ORC&B was not afforded an opportunity to offer evidence in support of its position in a hearing for that purpose. It appears that one of the things that ORC&B wanted to offer in evidence before the Commission was the collective bargaining agreement between Pullman and ORC&B. In this court, plaintiff ORC&B contends that the Commission should have imposed upon Pennsylvania and Pullman conditions to its approval of their modifications of the Contract which would have protected the Pullman conductors from job loss or compensated them therefor; that if the proposed modifications of the Uniform Service Contract amount to a changed pooling arrangement, then the Pullman employees are entitled not only to have the carriers request the Commission's approval of the changed pooling arrangements but also are entitled to have the Commission attach employee-protective conditions thereto.

It is interesting to note, from an examination of the record before the court, that in the proceedings before the Commission in 1947, the Order of Railway Conductors of America (predecessor of plaintiff ORC&B in this suit) advanced a similar argument for we find that in its Report made at that time the Commission said—

"The intervener, Order of Railway Conductors of America, upon oral argument expressed concern over the possible effect on Pullman employees, particularly those who are members of its organizations, of changes in the method of conducting the sleeping-car business which may result as a consequence of the decision of the district court in the antitrust suit. It urges that, as a condition of our approval of the pooling application, we require an arrangement to protect the interests of those employees with respect to their employment,"

and then observed,

"Moreover, this intervener's chief concern appears to be due to the possibility that a considerable number of railroads might exercise their right to perform a part of their sleeping-car service outside of the pooling plan, without employing the present Pullman conductors. This right was specifically safeguarded in the orders of the district court, presumably to keep Pullman from having a monopoly in the furnishing and servicing of sleeping cars, which the Department of Justice fears. We have no power to impose a restriction upon the exercise of that right for the purpose of protecting the employment rights of Pullman employees who might be affected. As shown in appendix B, the district court's order of January 4, 1946, was 'made without prejudice to the rights of the employees of the Pullman Company under existing contracts and practices.' Those rights will not be impaired by our approval of the pooling plan."

Concerning the hearing sought by ORC&B to introduce in evidence, among other things, the collective bargaining agreement between Pullman and ORC&B, the Commission's order under attack said, "but no allegations having been made that an abridgement of such pact, or of the Pullman employees' rights thereunder, would result from our continued approval of the present pooling agreement or from the current proposal of the Pennsylvania Railroad Company and its implementing contract, and it appearing that no such abridgement would so result, the said labor agreement is not here relevant and a hearing for its presentation in evidence herein is not necessary."

As the defendants here have pointed out, although the decree and the Commission's approval of the Pullman pool clearly provided for changes in the prior Pullman business practices with its customers, both the court and the Commission left in full operation the collective bargaining agreements of Pullman. The provisions of these agreements covering a reduction in forces or changes in working rules or conditions by Pullman, even though the reduction or changes might be related to an exercise of a railroad option to select the service to be performed by Pullman, continue to be operative, and the mandatory procedures of the Railway Labor Act for resolving disputes under the agreements or arising from changes in such agreements are applicable and available.

In its order of January 16, 1964, the Commission said—

"* * * no material changes in circumstances affecting railroad sleeping car service have been brought to our attention as being wrought by the Pennsylvania Railroad Company's proposal or otherwise, as to warrant a hearing for the purposes of reviewing the propriety of our continued approval of the said pooling agreement and of issuing a supplemental order regarding the terms and conditions of such continuing approval."

The court finds that the Commission had a sufficient basis in the record and in its previous orders on which to base the order under attack and that a further hearing for the presentation of evidence was not required (a) concerning the Commission's continued approval of the pooling agreement and its adherence to its earlier decisions which did not require the imposition of protective labor conditions or (b) concerning the proposed arrangement by Pennsylvania for partial sleeping car service.

The court finds that the Commission's order of January 16, 1964 is consistent with the Commission's prior, outstanding orders in Docket 29592; that it is consistent with the decrees of court in the antitrust proceedings which antedated and resulted in the Commission's Docket 29592; and that it is consistent with and conforms to Section 2 of the Uniform Service Contract.

This court concludes that the Commission's Findings, Conclusions, and Order dated January 16, 1964, herein sought to be set aside, are not illegal, arbitrary,

or capricious, as contended by plaintiffs, and that the said Order is rational, is in accord with applicable law and is based upon sufficient findings which are supported by substantial evidence of record.

The Commission's Order of January 16, 1964, was proper.

The relief prayed for by plaintiffs should be denied and the complaint should be dismissed.

PERRY, District Judge (dissenting):

I must dissent from the majority opinion in this case.

In my opinion, both the Commission and the defendants here lean too heavily upon Section 2 of the Uniform Service Contract which was approved by the Commission. That Section provides that a railroad, which itself desires to furnish part of the service in connection with its sleeping car operations, may request that Pullman furnish a partial form of sleeping car service on lines of the railroad, whereupon Pullman shall furnish such partial service on reasonable and non-discriminatory terms. The concluding clause of the Section, however,—which provides that the contract shall be subject to such modification as may, in a particular case, be necessary to provide reasonable and non-discriminatory terms therefor—has been read by defendants to permit, ad infinitum, future contract modifications, and all without obtaining the prior approval of the Commission, apparently on the ground that Commission approval of the Uniform Service Contract is approval of such future modifications.

It appears to me that when the Commission undertook to interpret the law and the meaning and effect of the Contract here involved, arriving at its determination that no hearing was necessary, it encroached upon a function reserved to the courts.

It is my view that the proposed modification here under consideration constituted not a partial withdrawal from the pooling arrangement but a complete change and modification thereof which, under Section 5(1) required a hearing

by the Commission and the taking of further evidence; that the Commission, an arm of the government and composed of members skilled as experts in all of the ramifications of transportation—technical, economic and social—failed to carry out the duty for which it was specifically created when it failed to hold such a hearing and to take evidence.

It is my further view that should the Commission approve the Pennsylvania's proposed change or modification of the Uniform Service Contract, (following the hearing required under Section 5(1) of the Act), that approval should certainly be conditioned on provisions to insure employee-protection. Otherwise, the involved Pullman employees could have no assurance of employment security even though their union be a party to a collective bargaining agreement on their behalf.

It was brought out in oral argument that about 53 Pullman conductors would lose their jobs under Pennsylvania's proposed arrangement in the instant case. In all likelihood, however, other railroad members of the pool will follow Pennsylvania's lead, in which event more than 600 Pullman employees will be jobless, engendering serious social and economic problems for a considerable segment of the employable public. Viewing the matter in a practical light, a large number of these employees are men who are not actually old but are too old to acquire other skills and too old to be absorbed by industrial concerns whose pension plan set-ups do not allow for the employment of, shall we say, more mature people. In their employment by Pullman over the years, these men have acquired seniority rights and they have moved closer to their day of retirement when they could expect the security of a pension which they have earned.

The Commission's determination, in the instant case, to dispense with the hearing could be that small hole in the dike which, as it widens, may well affect the employment status and rights of untold numbers of other employees; may well have an impact on the railroads

themselves in employer-employee relations and, finally, in the chain of events, may affect the public in the quality of the service rendered it.

Granted that the Commission has a heavy caseload and that a hearing on the instant matter could be time-consuming, and granted also that the problem of the plight of these Pullman employees is a thorny one, it is the responsibility and duty of the Commission to grasp the "thorny" thistle, to hold hearings, to take evidence and then to make its ruling.

I cannot lose sight of the fact that all of Pullman's stock is owned by the railroad-members of the pooling agreement and that Pennsylvania, which owns more than 118,000 shares of that stock, is one of the controlling shareholders. The proposed change or modification of the contract was not arrived at by two independent contracting parties, both sui juris. For all practical purposes, the agreement is a unilateral one, the terms of which were dictated by Pennsylvania. Pullman has been cast in the role of a mere puppet, with no volition of its own, and has been placed in a position of breaching its contract with ORC&B which, in turn, is left with no recourse because Pullman is simply going out of the business of employing members of ORC&B as and whenever Pennsylvania pulls the controlling strings.

It is a skillful legal maneuver by which the Pennsylvania in this case, and eventually all of the other Pullman stock-owning railroads, may breach with impunity to themselves and to Pullman the collective bargaining agreement between Pullman and ORC&B, and have the benefits of the Commission's approval of the pool, otherwise contrary to law—taking only the sweets and rejecting the bitters of the arrangement.

The Commission exceeded its authority when it failed to restrict itself to its field of expertise and when it refused to hold the hearing, sought by ORC&B, at which evidence might have been introduced to determine whether the new arrangement would be in the interest of better service to the public or of economy in operation.

I would remand the cause to the Commission for a hearing and the taking of evidence.