REA EXPRESS, INC., Plaintiff,

v.

ALABAMA GREAT SOUTHERN RAIL-
ROAD COMPANY et al., and the United
States of America, Defendants.

Interstate Commerce Commission,
Intervenor.

No. 71 Civ. 4278.

United States District Court,
S. D. New York.

Nov. 18, 1976.

Robert L. Wright, Washington, D. C. (Arthur M. Wisehart, Wisehart, Friou & Koch, New York City, of counsel), for plaintiff.

Edwin M. Zimmerman, Washington, D. C. (S. William Livingston, Jr., Covington & Burling, Washington, D. C., Frank H. Gordon and Rogers, Hoge & Hills, New York City, of counsel), for defendants Alabama Great Southern R. Co., and others.

Carl E. Newton, New York City (Thomas J. Ahlf, John W. Wall and Donovan, Leisure, Newton & Irvine, New York City, of counsel), for defendants The Chesapeake & Ohio R. Co., The Baltimore and Ohio R. Co., and Western Maryland R. Co.

Peter M. Shannon, Jr., Washington, D. C. (Arthur J. Cerra, Gen. Counsel, and Peter A. Fitzpatrick, Acting Associate Gen. Counsel, I. C. C., Washington, D. C., of counsel), for intervenor.

Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson and Catherine G. O'Sullivan, Dept. of Justice, Washington, D. C., for U. S. on the brief.

Before FRIENDLY, Circuit Judge, and KNAPP and GRIESA, District Judges.

FRIENDLY, Circuit Judge:

REA Express, Inc. (REA) here is both suing its former railroad owners and other holders of REA notes issued in 1959 and seeking the invalidation of Interstate Commerce Commission action taken in connection with those REA obligations. The complaint and the petition for review center upon the issuance of the 1959 notes and the creation of their antecedent, the so-called "non-negotiable debt," raising claims under section 10 of the Clayton Act, 15 U.S.C. § 20, section 1 of the Sherman Act, 15 U.S.C. § 1, sections 5(1) and 20a of the Interstate Commerce Act, 49 U.S.C. §§ 5(1) & 20a, and state fiduciary duty and contract law.

### I. The Facts and the Proceedings

Since the facts of REA's corporate life are set out at length in several of the sources cited below, our exposition can be confined to outlining the background of the present controversy over the 1959 notes and the non-negotiable debt.

REA was formed in late 1928 and early 1929 as a railroad non-profit joint venture to engage in the railway express business. The new corporation's initial 1,000 shares of common stock were to be sold to certain "participating" railroads in proportion to their 1923–26 express business. "Standard Express Operating Agreements" (SEOA's) which were executed by REA and all the railroads, including the "short line" non-shareholder roads, governed the REA—railroad relationship. These agreements provided that REA would be the exclusive express agency of the railroads and that REA's revenues, after the deduction of various operating expenses, would be distributed as "Rail Transportation Revenue" to the railroad signatories in proportion to their provision of services to the express company.

To finance its acquisition of the assets of the existing express company and to obtain working capital, REA was to sell $32 million of 5% bonds. The indenture called for semi-annual sinking fund payments of $800,000 over the 20-year term of the bonds. The original 1929 SEOA provided in Article V(4)(j) for an account # 409, "Surplus Applied to Sinking and other Reserve Funds;" moneys deposited in that account as sinking fund payments would be treated as REA expenses and therefore deducted from REA revenues prior to the computation of "rail transportation revenue" and distribution of this to the railroads.

In December 1928, application was made to the Interstate Commerce Commission for approval of these railroad plans for an express company. Approval of the "pooling" provisions of the SEOA was sought under § 5(1); of the railroads control of REA under § 5(2); and of REA's issuance of the common stock and the bonds under § 20a. On February 11, 1929, ICC approval was granted. *Securities and Acquisition of Control of Railway Express Agency, Inc.,* 150 I.C.C. 423 (1929).

By resolution of April 11, 1929, the REA board of directors adopted a different arrangement for funding the sinking fund. That resolution provided for semi-annual deductions of $800 per share of REA stock from the rail transportation revenues owed the shareholding railroads and a corresponding credit to those roads in an REA account entitled "non-negotiable debt to affiliated companies—advances." The reason for the change, as explained in the recent

report of the Commission, *Railway Express Agency, Inc., Notes,* 348 I.C.C. 157, 170–73, 178–79 (1975), was that the original method would have resulted in railroads whose services were disproportionately higher than their stock-holdings (including all the short lines) building up the equity of the stockholders through sinking fund payments. The resolution provided for annual interest of 5¼% on the debt.

In 1939, the outstanding 1929 bonds were refinanced at lower interest with notes also requiring semi-annual $800,000 installments to be paid again through shareholder railroad advances treated as further non-negotiable debt with an interest rate of up to 5% as set by the REA board. The note issue was approved by the Commission under § 20a in F.D. No. 12242, *Railway Express Agency, Inc., Notes,* 230 I.C.C. 478 (1938). The Commission's Director of Finance advised that there was no need to obtain § 20a approval of the non-negotiable debt.

In 1959, dissatisfaction with the profitability of the express business led to the substitution of a new agreement for the 1954 SEOA, which had replaced the original 1929 SEOA. The new agreement sought to improve REA's efficiency through the gradual ending of its nonprofit status. As part of this rethinking of the REA—railroad relationship, it was deemed desirable for REA to issue notes to the railroad shareholders in replacement of the non-negotiable debt. Unlike the non-negotiable debt, which was wholly subordinated to other creditors, the notes were subordinated only to certain existing REA fixed debt.[1] ICC approval of the 1959 SEOA's "pooling" provision was sought and an application for § 20a approval of the note issue was filed. The Commission approved the "pooling" provision on September 21, 1959. *Express Contract, 1959,* 308 I.C.C. 545 (1959). The issuance by REA of 5% notes to its shareholders was approved under § 20a by order of September 25, 1959 in Finance Docket No. 20812.

In the following years, several unsuccessful attempts were made to sell the railroads' REA stock. To facilitate such a sale, the majority of the stock was deposited in a voting trust in 1968 and it was agreed that the 1959 SEOA would be terminated at the end of the year; "Carrier's Agreements" terminating the SEOA provided for the post-1968 REA-railroad relationship. In June 1969, five REA executive officers who were part of a new management team assembled by February 1969 offered to purchase the REA stock through their REA Holding Corporation for over $2 million and warrants in the holding company. The deal was consummated in August 1969.

On September 30, 1971, REA filed a five-count complaint in this court attacking the notes and the non-negotiable debt. Count I alleged that the railroads violated § 10 of the Clayton Act in causing REA to create the non-negotiable debt in 1929 and again in 1938, to repay part of that debt prior to 1938 and to replace the debt with the notes in 1959. The second count charged that both the non-negotiable debt and the notes were void under § 20a(11) of the Interstate Commerce Act: the debt because it was "securities" within § 20a(2) of the Act but never approved under that section by the Commission, and the notes because the Commission's 1959 § 20a approval was conditioned on the continued operation of the 1959 SEOA which had been terminated in 1968. The absence of ICC approval of the debt also formed the basis of a third count contending that the notes were void despite their § 20a approval because the invalidity of the debt meant that the notes had been issued without consideration. The 1968 termination of the 1959 SEOA also served to support the claim in Count IV that the termination destroyed a condition of the notes. A fifth count charged that the con-

---

1. By order of August 9, 1961 in F.D. 20812, the ICC authorized the further subordination of the notes to REA loans for terminal construction and equipment acquisition. Certain REA—railroad agreements implementing this authorization additionally provided for the subordination of the notes to "indebtedness or obligations of REA incurred in the future if the Board of Directors of REA, when authorizing such indebtedness or obligations, adopts a resolution declaring such subordination."

duct alleged in the prior counts constituted a breach of fiduciary duty by the REA board caused by the railroad defendants. The complaint sought damages under several of the counts as well as a declaration that the debt and the notes were void.

Three of the railroad defendants moved on February 18, 1972 to dismiss the complaint for lack of jurisdiction on the ground that it amounted to an attack upon the validity of ICC orders so as to require a three-judge court under the Urgent Deficiencies Act, 28 U.S.C. §§ 2321–25. Judge Metzner granted the motion in part in a decision of June 5, 1972, holding that two of REA's claims—that the issuance of the notes violated § 10 of the Clayton Act and that the notes were unenforceable because the debt had never been approved by the ICC under § 20a—"directly attack a valid and subsisting ICC order—the order of September 25, 1959, approving the notes." *REA Express, Inc. v. Alabama Great Southern Railroad,* 343 F.Supp. 851, 859 (S.D.N.Y. 1972).

In an order of December 5, 1972, Judge Knapp, to whom the case had been assigned, granted REA leave to serve a second complaint. That complaint alleged jurisdiction under the Urgent Deficiencies Act, added the United States as a defendant, and included a new count alleging that the April 11, 1929 resolution of the REA board constituted price-fixing in violation of § 1 of the Sherman Act. On a motion by the defendants who had not joined in the original motion decided by Judge Metzner, Judge Knapp also dismissed for lack of single-judge court jurisdiction the same portions of the complaint dismissed by Judge Metzner, stating that the new motion "seeks to place the bulk of the defendants in the same position as the three prior movants so far as the allocation of jurisdiction between a one-judge and a three-judge court is concerned." Judge Knapp then

requested the convocation of a three-judge court. Such a court was designated on December 6, 1972, to consist of the writer, District Judge Knapp and District Judge Griesa.

On December 20, 1972, the three-judge court granted motions by the ICC to intervene in REA's suit and to stay further judicial proceedings pending the Commission's reopening of its F.D. No. 20812 for reconsideration of the 1959 § 20a approval of the notes. The Commission had voted to reopen the docket on August 10, 1972. On January 9, 1973, the Commission ordered the reopening. A motion by REA to vacate the stay and to enjoin the ICC order of reopening was denied on January 23, 1973. An appeal to the Supreme Court was unsuccessful. *REA Express, Inc. v. Alabama Great Southern Railroad,* 412 U.S. 934, 93 S.Ct. 2774, 37 L.Ed.2d 393 (1973).

On April 28, 1975, prior to the completion of the ICC proceeding, the defendant railroads moved for summary judgment dismissing the amended complaint. That motion relied on the Supreme Court's decision in *Bangor Punta Operations, Inc. v. Bangor & Aroostock Railroad,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), on the theory that all the conduct challenged in the complaint occurred before the transfer of ownership from the defendants to REA's new owners. On the same date, REA requested an order requiring the ICC to issue a final determination or, alternatively, to treat the 1973 report of an ICC administrative law judge as the Commission's final decision. At the argument on these motions before this three-judge court on June 18, 1975, representations were made that a decision by the ICC would follow shortly; in consequence no decision on REA's motions was made. We likewise deferred ruling on the railroads' *Bangor Punta* motion, primarily because we believed that REA's insolvency[2] raised questions under footnote 15 to Mr.

---

**2.** On February 18, 1975, REA filed a petition under Chapter XI of the Bankruptcy Act and was granted debtor-in-possession status. The bankruptcy court entered an order on March 21, 1975, permitting the litigation to continue. REA was adjudicated a bankrupt on November 6, 1975. By order of April 8, 1976, Bankruptcy Judge Galgay authorized REA's trustee to seek the setting aside of the ICC approval of the notes, the repayment of amounts already paid on them and other relief.

Justice Powell's opinion, 417 U.S. at 718 n. 15, 94 S.Ct. 2578, which might be more debatable than a decision on the merits would be, at least if the Commission were to revalidate its 1959 order.

On August 29, 1975, the Commission served a "Report of the Commission on Further Consideration" in *Railway Express Agency, Inc., Notes,* F.D. No. 20812, 348 I.C.C. 157, and ordered that its 1973 order of reopening be vacated and the proceedings discontinued. The report concluded that its September 25, 1959 order approving the 1959 notes had been correctly issued. The Commission found that the non-negotiable debt was in fact "debt" and not equity as its General Counsel's office apparently had thought at one point. In addition, the ICC rejected REA's claim that its 1959 § 20a order was erroneous because the notes lacked consideration, the non-negotiable debt allegedly being void for lack of approval under § 20a; the Commission held that the debt was not within § 20a. As to REA's claim of a violation of § 10 of the Clayton Act in the issuance of the 1959 notes, the ICC held that its § 5(1) order of September 21, 1959 exempted the notes from the anti-trust laws pursuant to the express immunity provision of the Interstate Commerce Act, § 5(11). The Commission refrained from stating a conclusion on the status of the non-negotiable debt under § 5(11) and on several other railroad positions.

On February 11, 1976, the ICC denied REA's petition for reconsideration of its report. REA filed petitions for review of "Orders of the Interstate Commerce Commission in Finance Docket No. 20812" in the District Court for the Southern District of New York and the Court of Appeals for the Second Circuit on April 8, 1976. The railroads were granted leave to intervene in the Court of Appeals on May 10, 1976. The petitions for review contain two claims of ICC error. First, REA claims that the notes were issued without consideration because the non-negotiable debt was created in violation of § 10 of the Clayton Act. Second, REA asserts that the Commission erred in approving the notes under the standards of § 20a and in its recent conclusion that the original approval was proper, emphasizing the alleged causal relation between the note issue and REA's subsequent bankruptcy. The petitions ask that the 1959 § 20a order be set aside, that the notes be declared void and that the noteholders be ordered to deliver into the bankruptcy court all payments collected on the notes.

■ Since it was debatable whether the Commission's recent action was reviewable in the Court of Appeals for the Second Circuit under P.L. 93–584, 88 Stat. 1917, amending 28 U.S.C. §§ 2321–25, or in the three-judge district court as part of its review of the 1959 order, the Chief Judge of the Second Circuit, on May 7, 1976, designated the writer, Judge Knapp and Judge Griesa as a panel of the Court of Appeals to hear REA's petition for review in that court. Accordingly we need not determine which court had jurisdiction although we incline to the view that jurisdiction remained in the three-judge district court [3] both because we doubt that the August 29, 1975, report was an order and because of the provision of § 10 of P.L. 93–584 that pending three-judge court actions "shall not be affected . . . but shall proceed to final disposition under the law existing on the date they were commenced." On June 1, 1976, the railroads filed supplemental motions for summary judgment relying on several non-*Bangor Punta* grounds for the dismissal of REA's complaint. We heard argument on September 24, 1976. The briefs and argument have made it apparent that the claims with respect to the various ICC orders, reviewable only by a statutory three-judge court (or perhaps in the case of the 1975 report by us as a panel of the Court of Appeals) are inextricably intertwined with issues determinable by the single district judge to whom the action was referred. Since we are of one mind as to the proper decision, we shall follow the

---

**3.** A decision denying the petition for review for the reasons set forth in this opinion is being filed in the Court of Appeals for the Second Circuit.

example of *Swift & Co. v. Wickham*, 230 F.Supp. 398, 410 (S.D.N.Y.1964), *appeal dismissed for want of jurisdiction*, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), *aff'd*, 364 F.2d 241 (2 Cir. 1966), *cert. denied*, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967), and dispose of the issues not requiring the presence of three judges as a non-statutory three judge district court. Here, as there, if the REA trustee desires to appeal and is authorized to do so by the bankruptcy court, he can protect himself by appealing both to the Supreme Court and to the Court of Appeals.

In the light of our conclusions on the merits we find it unnecessary to consider the question, not raised in any pleading or briefed or argued by the parties, how far, if at all, the decisions of Chief Judge Jones of the District Court for the District of Columbia in *REA Express, Inc. v. Travelers Ins. Co.*, 406 F.Supp. 1389 (D.D.C.1976), and of Judge Becker of the District Court for the Eastern District of Pennsylvania in *In re REA Express, Inc., Private Treble Damage Antitrust Litigation*, 412 F.Supp. 1239 (E.D. Pa.1976), constitute a collateral estoppel against REA. We likewise find it unnecessary to rule on the railroads' *Bangor Punta* motion or to consider many serious arguments of the railroads, particularly those based upon the statute of limitations and the antitrust immunity provision of § 5(11) of the Interstate Commerce Act, when read in the light of *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). In the interest of avoiding undue length this opinion also does not refer to still other arguments of the United States, the Interstate Commerce Commission, and the railroads that would require consideration if we had not found sufficient reason to reject REA's contentions on the grounds herein stated. Our failure to discuss these arguments in no way indicates disagreement with them.

## II. *The Non-Negotiable Debt*

We find it convenient to break our discussion of REA's complaints into three major headings. We shall deal in this section with attacks relating solely to the non-negotiable debt, in section III with attacks relating solely to the 1959 notes, and in section IV with the claim of breach of fiduciary obligation which relates to both. We do not mean, however, to imply that success in the attacks on the non-negotiable debt, which was retired in 1959, would inevitably produce any ultimate result favorable to REA; we simply find it unnecessary to address that question. As noted above, our discussion will encompass both REA's attacks on the ICC's orders and its claims for damages and other relief against the railroads.

### A. *Section 20a of the Interstate Commerce Act*

The attack on the non-negotiable debt most speedily answered is that it was void for lack of approval under § 20a of the Interstate Commerce Act, which was enacted as part of the Transportation Act, 1920. Section 20a(2) provides in pertinent part:

It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed "securities") or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and

which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose. . . .

Section 20a(11) provides in relevant part:

Any security issued or any obligation or liability assumed by a carrier, for which under the provisions of this section the authorization of the commission is required, shall be void, if issued or assumed without such authorization therefor having first been obtained, or if issued or assumed contrary to any term or condition of such order of authorization as modified by any order supplemental thereto entered prior to such issuance or assumption; but no security issued or obligation or liability assumed in accordance with all the terms and conditions of such an order of authorization therefor as modified by any order supplemental thereto entered prior to such issuance or assumption, shall be rendered void because of failure to comply with any provision of this section relating to procedure and other matters preceding the entry of such order of authorization. If any security so made void or any security in respect to which the assumption of obligation or liability is so made void, is acquired by any person for value and in good faith and without notice that the issue or assumption is void, such person may in a suit or action in any court of competent jurisdiction hold jointly and severally liable for the full amount of the damage sustained by him in respect thereof, the carrier which issued the security so made void, or assumed the obligation or liability so made void, and its directors, officers, attorneys, and other agents, who participated in any way in the authorizing, issuing, hypothecating, or selling of the security so made void or in the authorizing of the assumption of the obligation or liability so made void. In case any security so made void was directly acquired from the carrier issuing it the holder may at his option rescind the transaction and upon the surrender of the security recover the consideration given therefor.

While non-negotiable debt representing an advance from an owner may fall within the letter of the term "other evidence of . . . indebtedness," one would not normally speak of a carrier's "issuing" such debt. At best, therefore, the applicability of § 20a to the contracting of the non-negotiable debt would be doubtful. Any doubts, however, are resolved by the long-standing construction given to the statute by the Commission. In *Lehigh Valley R. R. Co. Conditional Sale Contract*, 233 I.C.C. 359, 362 (1939), the Commission rejected a contention that a conditional sale contract was a security under § 20a and, applying the rule of *ejusdem generis*, construed § 20a as being "restricted to evidences of interest in or indebtedness of a carrier that are similar to or in the nature of stocks, bonds, and notes." The Commission went on to indicate that obligations which have "none of the attributes of negotiability, and will not be issued or uttered" were not within § 20a(2). *Id.* at 365. It has specifically held that advances and open account debt are not covered by § 20a. *Operation of Line by Condon, Kinzua & Southern R. R.*, 145 I.C.C. 427, 429 (1928); *Duluth, South Shore & Atlantic Ry. Co. Trustees' Certificate*, 249 I.C.C. 393 (1941); *Bruce Motor Freight, Inc., Control and Merger*, 87 M.C.C. 436, 439 (1961); 73 I.C.C.Ann.Rep. 170 (1959). In 1971 the Commission instituted a rulemaking proceeding to consider whether it should revise its definition of "securities" so as, *inter alia*, to include advances. However, the Commission made it clear that these had previously been regarded as outside the scope of § 20a, *Expanded Definition of Term "Securities,"* 340 I.C.C. 817, 825 (1972); 344 I.C.C 114, 119–36, 146 (1973), and that any expanded definition would not be given retroactive application. In fact no new rule became effective. In addition to these general considerations we have here the 1938 opinion, noted above, of the Commission's Director of Finance that no § 20a approval was required for the arrangements among the railroads to finance the sinking fund of the 1939 notes by deductions from transportation revenues

payable to the stockholders and the corresponding creation of non-negotiable debt, and the Commission's recent holding that the non-negotiable debt did not require approval under § 20a, 348 I.C.C. at 206–09.

Granted that the Supreme Court's decisions on the degree of deference to be accorded an administrative agency's definition of terms in the statute which it administers may not be wholly consistent, *see Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 48–49 (2 Cir. 1976); 4 Davis, Administrative Law Treatise, § 30.01.09 (1958) and corresponding sections in 1970 and 1976 Supplements, this is a case par excellence for accepting the agency's interpretation. *Compare New York, Chicago & St. Louis Railroad v. Frank*, 314 U.S. 360, 372, 62 S.Ct. 258, 86 L.Ed. 277 (1941). The Commission's construction, while perhaps not inevitable, has support in reason, has been consistent and long continued and has been relied on by the carriers to such an extent that the Commission itself has recognized that any expanded definition could not in justice be retroactively applied. It would be extraordinary indeed if the Commission or a court were now to hold that the non-negotiable indebtedness was void for lack of approval under § 20a when an application for such approval would have been dismissed for lack of jurisdiction and the Commission's Director of Finance had told REA not to seek it.

### B. *Section 10 of the Clayton Act*

■ The foregoing analysis largely answers REA's claims that the incurring of the non-negotiable debt without competitive bidding violated § 10 of the Clayton Act. This provides in relevant part:

> No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm,

partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission.

Reserving the bulk of our discussion of § 10 for the 1959 notes, we think that as regards the non-negotiable debt, it is a sufficient answer that in 1914 when § 10 was enacted, no one would have considered non-negotiable debt representing advances from the owners of a carrier to be "securities" or "articles of commerce." The term "securities," used in § 10 of the Clayton Act, is more restrictive than the words "any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier" used in § 20a of the Interstate Commerce Act. If non-negotiable debt representing advances by owners is not within the latter, as we have held, it is surely not within the former. It is true that our conclusion as to the proper construction of § 20a rests in large degree on interpretation by the Interstate Commerce Commission, the agency charged with its enforcement. But the Commission is also charged with responsibilities under § 10 of the Clayton Act. It must issue regulations governing competitive bidding, receive reports of transactions within § 10 and report all violations to the Attorney General. The Commission has also recognized its responsibilities under § 10 by conditioning its approval of transactions which would violate that section on the use of competitive bidding.[4]

---

4. *See Securities of Western Pacific Railroad Co.*, 145 I.C.C. 750, 751 (1928); *Columbia Ter-* *minal Co.—Issuance of Notes*, 40 M.C.C. 288,

REA has cited no instance where the Commission has ever done this when the transaction involved the making of advances from an owning carrier with an interlock—a situation presented in the 1938 rearrangement in this very case. To the contrary the Commission has sanctioned the issuance of securities by a carrier to a parent to retire advances from the parent without intimating that the advances were within § 10.[5] It would be perverse indeed for the Commission or for us now to construe § 10, a statute carrying severe criminal penalties, to include as "securities" advances represented by non-negotiable debt. For the same reasons here developed, there is nothing in REA's argument that the partial repayment of the non-negotiable debt or its retirement in 1959 was a dealing in securities within § 10 of the Clayton Act.

### C. Section 1 of the Sherman Act

 REA's claim, which it did not brief, that the incurring of non-negotiable debt was a conspiracy to restrain trade or commerce because the owning railroads agreed with REA and with each other on interest rates borders on the frivolous. The agreement was between the railroads and their wholly-owned subsidiary; the interests of no other person were affected. We agree with Judge Becker, 412 F.Supp. at 1256, that "the law is plain that a wholly-owned subsidiary has no right to economic independence of all its parents acting unanimously and that no antitrust claims may be founded upon the absence of such independence." Compare In re Penn Central Securities Litigation, 367 F.Supp. 1158, 1166–67

(E.D.Pa.1973). The contrary proposition—that agreements between parents and subsidiaries effecting only their internal relationships violate the Sherman Act—has been repudiated by several commentators, including Justice Department officials charged with enforcing the antitrust laws. See Report of the Attorney General's National Committee to Study the Antitrust Laws 34 (1955); [6] Conference on the Antitrust Laws and the Attorney General's Committee Report 18 (1955) (statement of Edward V. Johnston); id. at 35–36 (statement of George E. Hale); An Interview with the Honorable Donald F. Turner, 34 Antitrust L.J. 113, 123 (1967); Letter of Richard W. McLaren, CCH Trade Reg.Rep. ¶ 50,122, at 55197 (1971); ABA, Antitrust Law Developments 33 (1975).

In addition, we are unable to perceive what damage REA suffered from the fixing of the interest rate at 5%, 5¼% or whatever rather than a lower figure. Since under the SEOA the interest was a deduction from the transportation revenue payable to the railroads, a lower interest rate would have meant correspondingly higher payments. To be sure, the shares of the railroads would have been different, but that is not REA's affair.

### D. Violation of § 5(1) of the Interstate Commerce Act

 A point pressed with particular vigor at the oral argument is that creation of the non-negotiable debt was never approved under § 5(1) of the Interstate Commerce Act, and that such approval was re-

---

293–94 (1945). See also Securities of Seaboard Air Line Railway, 138 I.C.C. 190, 194 (1928).

5. Stock of St. Louis & Ohio River R.R., 90 I.C.C. 700 (1924); Eldorado & Santa Fe Ry. Co. Bond, 170 I.C.C. 620 (1931); New York & Long Branch R.R. Co. Bonds, 252 I.C.C. 142 (1942).

6. Reviewing the so-called "intra-enterprise conspiracy" cases, e.g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), the Report concluded:

Nothing in these opinions should be interpreted as justifying the conclusion that concerted action solely between a parent and subsidiary or subsidiaries, the purpose and effect of which is not coercive restraint of the trade of strangers to the corporate family, violates Section 1. Where such concerted action restrains no trade and is designed to restrain no trade other than that of the parent and its subsidiaries, Section 1 is not violated.

See also ABA, Antitrust Developments 1955–1968 19–22 (1968) (supplementing the 1955 Report).

quired. Although this claim does not seem to have been advanced in the complaint or petition to review, the railroads and the Commission responded at the argument and we think it best to rule upon it now rather than leaving the issue to subsequent amendment.

In relevant part, § 5(1) provides: [7]

Except upon specific approval by order of the Commission as in this section provided, and except as provided in paragraph (16) of section 1 of this title, it shall be unlawful for any common carrier subject to this chapter, chapter 8, or chapter 12 of this title to enter into any contract, agreement, or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; and in any case of an unlawful agreement for the pooling or division of traffic, service, or earnings as aforesaid each day of its continuance shall be a separate offense: *Provided,* That whenever the Commission is of opinion, after hearing upon application of any such carrier or carriers or upon its own initiative, that the pooling or division, to the extent indicated by the Commission, of their traffic, service, or gross or net earnings, or of any portion thereof, will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition, the Commission shall by order approve and authorize, if assented to by all the carriers involved, such pooling or division, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises
. . . .

REA's argument runs as follows: The SEOA presented to the ICC for approval in F.D. No. 7316 in 1929 had provided that payments to the railroads should be com-

puted in the following manner, *see* 150 I.C.C. at 439–41: Under section 4 of article V, gross transportation revenues were to be determined by taking into account four categories of income which are not here in question. From these there "shall be deducted the following charges and items of expense. . . ." One category, (j), was entitled Profit and Loss Debits. "This item shall include the following accounts:

409. Surplus Applied to Sinking and other Reserve Funds. . . ."

Under the SEOA as it stood when Commission approval was sought the carriers thus were to contribute to REA's sinking fund in proportion to the transportation revenue from express traffic moving over their lines and the amounts thus contributed would have been recorded in Account 409. If this had been done, the payments to the railroads would have been less and the non-negotiable debt would never have been created. The changed method provided in the resolution of REA's board of directors dated April 11, 1929, mentioned above, whereby no charges were made to Account 409 and the sinking fund was financed by advances from the owning railroads in proportion to their stock holdings, which resulted in lower "net earnings" for REA, was never approved by the Commission and therefore violated § 5(1).

We find little in the language of the statute to compel the reading for which REA argues. Neither does there seem to be any policy reason for holding that § 5(1) required ICC approval of the sinking fund arrangement. As the 1975 Commission report details, the April 11, 1929 resolution creating the debt was designed largely to prevent maldistributions of the sinking fund burden among the railroads. *See* 348 I.C.C. at 170–73. From the point of view of the owning railroads, the resolution merely changed the form of their investment in REA from all stock to a combination of stock and debt; from REA's standpoint,

---

7. As originally enacted in 1887, § 5 flatly prohibited the pooling of freight or revenue. Act to Regulate Commerce, 24 Stat. 380. Transportation Act, 1920, added a proviso permitting

such agreements when approved by the Commission. 41 Stat. 480–81. The Transportation Act of 1940, 54 Stat. 905, generally amended the section, yielding the current § 5(1).

although in neither case would it have been left with any surplus income of its own, the alteration left it with a debt to its owners that otherwise would have been paid off through deductions in the amounts distributed as real transportation revenue. *See* 348 I.C.C. at 197. Since, however, REA was a non-profit corporation wholly-owned by the railroads, this difference to it had little effect on its capacity to provide express service.

Furthermore, it seems clear that the ICC has never read § 5(1) as requiring the approval of financing provisions. The Finance Docket No. 7316 application of December 18, 1928 for § 5(1) approval of the 1929 SEOA asked only that the agreement be approved "as and to the extent required by" § 5(1) and referred to the Commission's decision in *Express Contract, 1920,* 59 I.C.C. 518 (1920) in which the Commission granted § 5(1) approval to the provision in article V of the proposed standard contract between the railroads and REA's predecessor, the American Railway Express Company, for distributing the express company's earnings among the company and the railroads. The Commission there determined, although with some hesitation, to treat the plan as a § 5 "pooling," saying:

> The question at the threshold is, whether the proposed contract embodies a pooling arrangement within the purview of section 5 of the act, to the lawful consummation of which our approval is an essential prerequisite. Counsel for the railroad petitioners is of the opinion that it does; counsel for the express company takes the opposite view. We concur in the view that the plan proposed is a pooling arrangement, prescribing the division of "net proceeds of the earnings of such railroads" otherwise than according to individual performance. The act in terms relates to such arrangements between "competing railroads," and an ascertainment that the arrangement "will not unduly restrain competition" is one of the necessary elements of an approval by us. While primarily the provision plainly has in comtemplation independently operated railroad lines competing with each other in rates and services pertaining to freight traffic, the language is broad enough to include all operations productive of railroad revenues. The lawfulness of unified express operations over all railroad lines by one express company is established by other provisions of the act, and the applicability of the polling provision of section 5 rests finally upon the question whether in the situation there is or could be as between the railroad lines a competition which article V of the contract might unduly restrain. While counsel for those lines contends that there might be competition in point of service, it is not entirely clear that there could be competition of any character. The only rates and services here considered are those of one carrier, the express company; the statutory right of a shipper to designate the routing of his traffic and the correlative duty of a carrier to observe his instructions come into play only where "two or more through routes and through rates shall have been established" and there is "a connecting line" to which the initial carrier can make delivery pursuant to the instructions.

> Because of these questions, as to which there is room for doubt, and because of our views of the merits, we shall for present purposes proceed upon the assumption that article V of the contract is within the provisions of section 5 of the act.

59 I.C.C. at 521–22. However, the Commission further expressly noted the limited nature of its § 5(1) inquiry:

> With regard to the requested approval of provisions of the proposed contract, it does not rest with us to give or withhold approval further than as above under section 5 of the act. If the contract is entered into and controversies should arise between the parties thereto the courts constitute the forum in which they could and should be adjudicated, and we, therefore, decline to express any opinion with regard to the particular provisions

of article V or any other part of the contract.

59 I.C.C. at 523.[8]

In its 1929 decision, the Commission similarly seems to have considered the need for § 5(1) approval to be limited:

> The particular portion of the operating agreement to which our jurisdiction extends and which requires our approval under paragraph (1) of section 5 is the pooling of earnings arrangement embodied in Article V, which is given in full in Appendix B. In *Express Contract, 1920,* [59 I.C.C. 518 (1920)], we had under consideration a similar pooling arrangement which is now a part of the existing uniform express contracts. Our report in that proceeding and the action taken thereon are controlling in the instant applications. In its material terms the pooling arrangement in Article V of the proposed operating agreement is substantially the same as in that article of the uniform express contracts, any differences being due to the fact that as now constituted the Express Company is privately owned and operated for profit, while the Express Agency will be controlled by the participating railroads, and the earnings remaining after accounting for all items of income and deductions therefrom will be designated "rail transportation revenue" and paid to the carriers within specified groups that are entitled to receive it. In arriving at the amount of such revenue, provision is made under item (j) of section 4 of this article for deducting certain profit and loss debit items therein enumerated, including surplus applied to sinking funds or set aside for investment in physical property. The effect of this will be to reduce the operating revenues of the railroad carriers which they derive from express traffic by amounts which are in reality appropriations of surplus. It should be understood that all that we are here passing upon is the plan for pooling and dividing earnings and we are not passing upon other provisions of the contract, such as that mentioned above. Nothing herein contained is to be construed as an expression of opinion upon the propriety of such deductions in connection with the determination of recapturable income under section 15a of the interstate commerce act.

150 I.C.C. at 433–34. The 1929 order was in accord:

> *It is further ordered,* That Article V of said proposed operating agreement be, and it is hereby approved and authorized solely in so far as it provides for a division of earnings for which the commission's approval and authorization is required under paragraph (1) of section 5 of the interstate commerce act.
>
> *And it is further ordered,* That nothing herein shall be construed as approving any particular provisions of Article V or of any other part of said proposed operating agreement.

150 I.C.C. at 442–43.

The Commission adhered to this position in its further consideration of article V in a 1950 proceeding under § 5(1). *Express Earnings, Plan and Method of Division,* 278 I.C.C. 505 (1950). In an earlier rate proceeding, the Commission had referred to a supplemental agreement embodying a so-called economy plan for dividing revenue from interline traffic and apparently took the view that it required separate § 5(1) approval:

> The supplemental agreement was not filed with us until after the hearing herein, and no application has been made for modification of our order setting forth the terms under which the pooling of revenues and division of earnings were authorized, and to that extent the Express Agency and carriers parties to the arrangement apparently are in violation of section 5(1) of the act, and of our order setting forth the authorized method of apportionment. The Express Agency will

---

8. This may have been occasioned by Commissioner Eastman's criticism, in dissent, of the "wrong theory" embodied in article V—"to enhance the value of the express company's securities and safeguard its financial operations." *See* 59 I.C.C. at 523–28.

be expected to comply with that provision of the act.

*Increased Express Rates and Charges, 1946,* 266 I.C.C. 369, 380–81 (1946). The Commission, however, then decided that no § 5(1) action was required:

Upon further consideration, we are of the opinion that the action of the Agency in adopting the economy plan without applying to us for a supplemental order was in no way unlawful. In considering the present arrangement, as well as its predecessor in 1920, we pointed out specifically that we were approving only the general plan for pooling and dividing earnings and were not passing upon the particular provisions of article V or any other part of the contract. *Express Contract 1920,* 59 I.C.C. 518, 523; *Railway Exp. Agency, Inc., Securities and Control,* [150 I.C.C. 423], pages 434, 442, and 443. The economy plan supplemented a particular provision of article V which related to the apportionment of revenue on shipments moving over more than one line of railroad and was not included in the approval and authorization given in the last-cited report. It appears, therefore, that no action on our part was or is now required to validate the use of the economy plan.

278 I.C.C. at 509. Similarly, in its § 5(1) approval of the 1954 SEOA, the Commission stated:

In the proposed contract article 10 replaces article V, which has been rewritten and amplified. As at present, the railroads are classified in four groups—eastern, southern, western, and mountain-Pacific, but a change has been made in the method of dividing revenue from intergroup traffic which presumably disposes of the controversy discussed in our 1950 report before referred to. Article 10 is lengthy and includes numerous accounting matters. We see no reason for repro-

ducing it here, since it is unnecessary that we pass upon the specific details thereof.

*Express Contract, 1954,* 291 I.C.C. 11, 12–13 (1953). And when it approved the 1959 SEOA under § 5(1), the Commission observed:

Necessarily numerous details of the proposed agreement have not been discussed in this report for the reason that they are not germane to the broad issue of pooling. In prior reports the articles of the contracts dealing with the division of earnings have had principal consideration, but the Commission has deemed it unnecessary to pass upon the specific details thereof.

*Express Contract, 1959,* 308 I.C.C. 545, 551 (1959).[9]

Additionally, although perhaps the Commission was not there addressing the § 5(1) argument REA makes here, conclusions reached in its 1975 report support the proposition that § 5(1) was not violated by the change in the method of financing the sinking fund. The report recounts the genesis of the non-negotiable debt and the Commission's knowledge of this in 1929 and through later proceedings. Referring to the argument of its Office of General Counsel "that procedures followed by the parties in 1929 differed from, or 'were contrary to,' the procedures approved by the Commission in its 1929 order approving the operating agreement"—a point also said to be "the major argument of REA"—the Commission stated:

We think it clear from our 1929 report that we were not requiring any specific method of accounting for the sinking fund and computing rail transportation revenues . . . .

. . . From a review of our own records and the new evidence received, we are satisfied that the Commission was adequately advised of the possibility of

---

**9.** In two other § 5(1) proceedings involving REA, the Commission never indicated that the sinking fund arrangement required specific § 5(1) approval. *See Express Contract, 1929,* 275 I.C.C. 739 (1951) (reaffirming § 5(1) approval following government antitrust suit);

*Railway Express Agency, Inc. and Certain Railroad Carriers' Application for Authority to Contract for Pooling and Division of Earnings,* 227 I.C.C. 517 (1938) (approving addition of Southern Railway Company and affiliates).

alternate methods of accounting for the sinking fund. This appears to be reflected in our report, which we view as permitting the method finally adopted. 348 I.C.C. at 205.

To be sure, the Commission's view of the sweep of § 5(1) is not conclusive. But here, as in the case of § 20a, there is every reason to defer to the Commission's practice. As indicated in the extract we have quoted from *Express Contract, 1920*, 59 I.C.C. at 521–23, "the applicability of the pooling provision of section 5 rests finally upon the question whether in the situation there is or would be as between the railroad lines a competition which article V of the contract might unduly restrain." It is hard to see how the restraint would be affected by whether the sinking fund was created by proportionate deductions from transportation revenues or by advances proportionate to stock ownership.[10]

What little case law there is under § 5(1) suggests that the Commission's reasonable views on when a new § 5(1) order is required will be respected. In *Order of Railway Conductors & Brakemen v. United States*, 263 F.Supp. 650 (N.D.Ill.1966), *aff'd per curiam*, 388 U.S. 455, 87 S.Ct. 2108, 18 L.Ed.2d 1316 (1967), the pooling agreement that had been submitted to the Commission by the Pullman Company and certain railroads provided for the operation of the sleeping car business. That contract permitted the railroads to request partial service from Pullman and after the Pennsylvania Railroad Company requested such service, Pullman and the Pennsylvania executed, without seeking further § 5(1) approval, an "Amendment to Uniform Service Contract" delineating those terms. The new agreement initially was enjoined and

declared violative of § 5(1) subject to the Commission's approval or its determination that no additional approval was necessary. *Brogan v. Pennsylvania Railroad Co.*, 211 F.Supp. 881 (N.D.Ill.1962). The ICC then determined that the agreement was "fully contemplated" by and "not inconsistent" with the agreements previously submitted and did not require specific approval or violate prior orders. *Proposed Pooling of Railroad Earnings and Service Involved in Operation of the Pullman Co. under Railroad Ownership*, 322 I.C.C. 100 (1964). That decision was upheld on review, the three-judge court finding that the new agreement "was not a new or changed arrangement for pooling." 263 F.Supp. at 655.[11] *See also Mover's & Warehousemen's Association v. United States*, 303 F.Supp. 563, 568–69 (D.N.J. 1969) (ICC approval of acquisition prior to approval of substitution of acquiring corporation in carrier's previously-approved pooling agreement not error; "It would appear that the mere filing with the Commission of the proposed agreement should satisfy the requirements of the decision under review and we agree that it suffices for the Commission's purposes.").

## III. *The 1959 Notes*

Two of the attacks on the validity of the 1959 notes—those under § 1 of the Sherman Act and § 10 of the Clayton Act—are similar to those on the non-negotiable debt, although the Clayton Act claim with respect to the notes cannot be disposed of, as it was in the case of the non-negotiable debt, on the ground that there was no "issuance" of "securities." Two other challenges to the notes' § 20a approval are the contention apparently initially raised by the Commission's staff that the non-negotiable

---

**10.** *See also American Rail Box Car Co.—Pooling*, 347 I.C.C. 862, 882–84 (1974), where the Commission referred to its power under § 5(9) to react on its own initiative to pooling agreement changes and stated that it has required new approval only when the changes "can clearly be characterized as substantive in nature, and include entirely new service contracts or modifications in the basic policy by which pooled revenues are to be distributed."

**11.** Both the Commission and the reviewing court relied in part on the uniform contract's provision for "such modification as may, in the particular case, be necessary to provide reasonable and non-discriminatory terms" for furnishing partial service, thus indicating that a § 5(1) approval need not be of the exact terms of the agreement.

debt was not true debt but rather was equity and there was therefore no consideration for the issuance of the notes, and REA's claim that the Commission erred in finding that their issuance complied with the terms of § 20a(2). A final claim is that the notes and their § 20a authorization were conditioned on continuation of the 1959 SEOA which was terminated in 1968.

## A. Section 1 of the Sherman Act

■ As in the case of the non-negotiable debt, REA has taken the position in its proposed third complaint that the fixing of the 5% interest rate on the 1959 notes by agreement between the railroads and REA constituted price-fixing which is a *per se* violation of § 1 of the Sherman Act. Since this claim is closely related to the Sherman Act attack on the debt, it seems best to pass upon it now rather than leaving the point open.

On this subject we have little to add to our discussion in Section II C. If REA had been owned by only one railroad, it could scarcely be claimed that an agreement fixing the rate of interest on notes issued to retire advances on open account constituted price fixing forbidden by the anti-trust laws. We see no reason for taking a different view because of the ownership of REA by a large number of railroads.

## B. Section 10 of the Clayton Act

■ To the writer the inapplicability of § 10 of the Clayton Act to a refunding by notes of open account debt owed to the stockholders of a joint facility is clear, for reasons stated in his concurring opinion in *Klinger v. Baltimore & Ohio R. R. Co.,* 432 F.2d 506, 516–19 (2 Cir. 1970)—a line of reasoning followed in *Cleary v. Chalk,* 159 U.S.App.D.C. 415, 488 F.2d 1315 (1973), *cert. denied,* 416 U.S. 938, 94 S.Ct. 1940, 40 L.Ed.2d 289 (1974). However, a majority of the *Klinger* court held that a sale by one railroad to another, with which there was an interlock, of stock and notes of a jointly owned terminal subsidiary constituted a

dealing in securities within the scope of § 10. Whether correct or not, the holding is distinguishable. The *Klinger* majority's conclusion that the words of § 10 were "broad enough to cover the collateral abuse of a common carrier accepting inadequate consideration for securities from the interlocked purchaser," 432 F.2d at 510, related to a case where "the interlocked purchaser," the B&O, owned 42% of the stock of the seller, the Reading. There was thus a danger that the B&O might have overreached the Reading to the detriment of its other stockholders, an end against which the majority thought § 10 of the Clayton Act was designed to protect even on the facts there at hand. No such evil is present where owners deal uniformly with their wholly-owned subsidiary. Thus, even if § 10 reached "the collateral abuse" in *Klinger,* there is simply nothing to indicate that Congress meant that provision to cover a securities transaction between a carrier and all its owners. The "evident purpose" of the statute—"to prohibit a corporation from abusing a carrier by palming off upon it securities, supplies and other articles without competitive bidding and at excessive prices," *Minneapolis & St. Louis Railway v. United States,* 361 U.S. 173, 190, 80 S.Ct. 229, 240, 4 L.Ed.2d 223 (1959), or in the converse case, by "buying something too cheaply," *Klinger, supra,* 432 F.2d at 512— is not at all apposite in such a transaction. After issuance of the notes REA was in no different position vis-a-vis its owners than before, except that the notes had a fixed term, certain sinking fund requirements and less severe subordination provisions. The Supreme Court has characterized § 10 of the Clayton Act as "a rather narrow prohibition applicable to activity that is conceptually within the antitrust philosophy." *United States v. Boston & Maine Railroad,* 380 U.S. 157, 162, 85 S.Ct. 868, 871, 13 L.Ed.2d 728 (1965). It would be unduly literalistic to read that section as applying to the issuance of the 1959 notes. Obviously the Commission did not consider it to be applicable; if it had thought so, it would have required competitive bidding, as

the cases cited in fn. 4, *supra,* clearly indicate.[12]

### C. *Invalidity of the order under § 20a approving issuance of the 1959 notes*

■ Our previous discussion has removed most of the grounds on which REA asserts that the order of September 25, 1959 under § 20a approving the issuance of the 5% notes was invalid. Apart from the question whether there was no consideration for issuance of the notes since the non-negotiable debt constituted equity, all that is left is REA's assertion that the Commission had no sufficient basis for finding that issuance of the notes was "compatible with the public interest" and "necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier" and would not "impair its ability to perform that service." Heavy emphasis is placed on REA's present financial plight and the fact that the non-negotiable debt was subordinated to all claims of other creditors where as the notes carried only a limited subordination.

A principal purpose for our granting a stay pending a report from the Commission was to enable it to give further consideration to these issues. In its 1975 report the Commission stated, 348 I.C.C. at 162:

> After reviewing the record in this proceeding and related proceedings, we are convinced that the Non-Negotiable Debt was clearly a "debt" of REA from the time of its creation until its discharge by the issuance of the 1959 notes. Therefore, the 1959 notes were not "incorrectly approved" by us due to lack of consideration. We have found no great difficulty in concluding that something which the parties call "debt," and consistently treat as "debt," is, in fact, "debt," and the evidence and arguments supporting our conclusion are set forth below.

The Commission elaborated on this, 348 I.C.C. at 206:

We have reviewed the treatment of the Non-Negotiable Debt over a period of 40 years by the railroads, REA, third parties, including banks, and the Commission, and we have found a practically unanimous acceptance of this instrument as a debt. The evidence in support of the "debt" characterization includes action by businessmen and bankers involving substantial sums of money, opinions by attorneys knowledgeable in the field and action or forbearance by government agencies, including the Internal Revenue Service and ourselves. (Among our own actions is our 1928 report indicating our awareness of the system of interest-bearing advances, and our 1938 order authorizing an issue of notes to be repaid through this system.) Many persons and businesses have acted in reliance upon the Non-Negotiable Debt being debt. This would include the present owners of REA who purchased it for slightly over $2 million in 1969. It was clear from the purchase negotiations and terms that sellers and buyers assumed of the 1959 notes were valid. We are certainly not basing our decision on the fact that the new owners would receive a $27 million wind-fall, but we do mention it as one not insubstantial consequence of revoking our 1959 order. From the foregoing, we conclude that the Non-Negotiable Debt is in fact, debt.

Our review of the evidence convinces us that this conclusion is amply supported.

We also reject the contention that the Commission had no sufficient basis for permitting issuance of the notes even if the non-negotiable debt was what it purported to be. REA's argument amounts to condemnation by hindsight. REA itself placed in evidence a 1959 offer by a highly responsible firm of investment bankers to purchase all of REA's stock for $500 per share and pay off the non-negotiable debt within two years; clearly the firm considered REA to be a viable enterprise. Since the non-negotiable debt apparently was payable upon demand, its conversion into a debt maturing

---

**12.** Indeed, in *Securities of Western Pacific R.R. Co., supra,* 145 I.C.C. at 753, the Commission approved a subsidiary's issuance of promissory notes to its parent without competitive bidding, expressly indicating that it did not consider the transaction within § 10 despite an interlock.

on December 31, 1973, with sinking fund payments to begin only in 1965, afforded a significant benefit to REA, balancing in considerable degree the change regarding subordination. Moreover, there was no reason for the railroads to continue subordination after the intended beneficiaries had been paid. REA paid interest on the notes until 1971 when it stopped such payment upon the bringing of this action. As late as 1974 REA had an operating profit of $2.8 million as compared with an annual interest charge of approximately $1.4 million on the notes. REA simply has not demonstrated a relation between the 1959 notes and its current financial plight sufficient to require a conclusion that the Commission erred either in 1959 in approving the notes or more recently in refusing to reverse that authorization.

Beyond all this, review of a § 20a order after the parties have acted upon it presents peculiar difficulties. *Cf. New York, Chicago & St. Louis Railroad v. Frank, supra,* 314 U.S. at 372, 62 S.Ct. 258. A prime purpose of § 20a is to protect the purchaser of railroad securities. *See Interstate Investors, Inc. v. United States,* 287 F.Supp. 374, 387 (S.D.N.Y.1968), *aff'd per curiam,* 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969); I. L. Sharfman, The Interstate Commerce Commission 190 (1931); III B. Schwartz, The Economic Regulation of Business and Industry 1705 (1973) (remarks of Sen. Lenroot). This objective would hardly be accomplished by holding, as REA urges, that if the Commission erred in allowing the securities to be issued, they should be held void. However, we are not obliged to rely on this consideration since we perceive no ground for invalidating the Commission's 1959 order.

## D. *Effect of termination of the 1959 SEOA in 1968*

Little need be said with respect to the counts of the complaint which allege that the December 31, 1968 termination of the 1959 SEOA as part of the planning leading to the sale of the REA stock to its new management in 1969 worked a discharge of the 1959 notes and that approval of the notes was conditioned upon continuation of the 1959 SEOA. Judge Metzner rejected the latter contention, 343 F.Supp. at 860, for reasons with which we agree, and REA has briefed neither point. Only the clearest language would support a claim that, by altering the SEOA as part of the events whereby REA became an independent entity, the railroads meant to discharge over $27 million of notes and leave the purchasers with a debt-reduced enterprise. We find none.

## III. *Alleged Breach of Fiduciary Duty*

All that remains for consideration is Count V of the amended complaint which charges that the railroads caused the REA directors to breach their fiduciary duty in creating the non-negotiable debt, in retiring it by issuing the 1959 notes, and by terminating the 1959 SEOA in 1968. Our rulings on other issues have eliminated most of these claims. What is left requires little discussion. Apart from the conceptual difficulty in finding a breach of fiduciary duty when directors take action desired by all the shareholders, *see In re REA Express, Inc., Private Treble Damage Antitrust Action, supra,* 412 F.Supp. at 1257–58, we see nothing in any of the challenged transactions that could constitute such a breach. Here again, although REA denies that it has abandoned the point, it has not developed this in its extensive briefing.

---

So much of this complaint as challenges the validity of orders of the Interstate Commerce Commission and the petition to review are dismissed for failure to state a claim upon which relief can be granted; the railroads' motion for summary judgment with respect to other portions of the complaint is granted. The United States, the Interstate Commerce Commission and the railroads shall recover their costs. These shall be promptly taxed and filed in REA's bankruptcy proceedings. With respect to various motions and counterclaims which are not before us, the parties are directed to proceed expeditiously before Judge Knapp

in light of this opinion, to the end that this litigation may be speedily concluded.